T.C. Memo. 2015-235

UNITED STATES TAX COURT

TERRY M. SCHANK AND PAULA J. SCHANK, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

TWIN CITY ROOFING AND SHEET METAL, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16641-14, 16642-14.　　　　　Filed December 9, 2015.

Alvin S. Brown, for petitioners.

Michael J. De Matos, Rose E. Gole, and Steven R. Gallo, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge: The two cases captioned above are consolidated for purposes

of trial, briefing, and opinion. Petitioners Terry M. Schank, Paula J. Schank

(collectively, Schanks), and Twin City Roofing and Sheet Metal, Inc. (Twin City),

[*2] petitioned the Court to redetermine deficiencies respondent determined in their Federal income tax for the 2011 tax year for the Schanks and the 2011 fiscal year[1] for Twin City as well as accuracy-related penalties under section 6662(a)[2] as follows:

| Petitioner | Deficiency | Accuracy-related penalty sec. 6662(a) |
|---|---|---|
| Terry and Paula Schank | $82,486 | $16,493.60 |
| Twin City Roofing and Sheet Metal, Inc. | 198,556 | 39,711.20 |

[1]The Schanks use a calendar year for tax reporting. Twin City uses a fiscal year beginning on July 1 and ending on June 30 of the following year. For the purposes of this opinion, "2011 fiscal year" means the period from July 1, 2010, to June 30, 2011.

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect for the tax periods in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] After petitioners made certain concessions in a stipulation of settled issues,[3] we decide the following issues:[4]

(1) whether the burden of proof in these cases should be shifted under section 7491(a) to respondent. We hold it should not;

(2) whether Twin City's payments totaling $371,892 incurred on the Schanks' behalf for the construction of their house and a barn, payment of personal credit card bills, and purchase of a 2009 Can-Am Spyder Roadster (Spyder) should be characterized as compensation under section 162(a)(1) or as a

---

[3]Petitioners made the following concessions: (1) that Twin City underreported its gross receipts by $12,287 for the 2011 fiscal year; (2) that Twin City is not entitled to deduct compensation payments totaling $155,000 which consisted of payments of $75,000, $30,000, $25,000, and $25,000 to Mr. Schank, Mrs. Schank, Crystal Palser, and Tara Pope, respectively, because the payments were made in September 2011 and therefore were outside the 2011 fiscal year; (3) that Twin City is not entitled to deduct travel expenses of $1,226 for the 2011 fiscal year; (4) that the Schanks received unreported compensation of $1,492 for tax year 2011; (5) that Twin City's charitable contribution deduction for the 2011 fiscal year is computational and will be determined in accordance with the resolution of these cases; and (6) that the Schanks' alternative minimum tax is computational and will be determined in accordance with the resolution of these cases.

[4]In addition, petitioners raised the issue of Twin City's eligibility for a domestic production activities deduction in their pretrial memorandum. However, because petitioners failed to introduce any evidence on this issue and plead it properly in their briefs, we deem any such argument to be waived. See Mendes v. Commissioner, 121 T.C. 308, 313-314 (2003) (holding that arguments not addressed in brief may be considered abandoned).

**[\*4]** constructive dividend. We hold that the payments should be characterized as a constructive dividend;

(3) whether Twin City can deduct expenses for the prepayment of a lease where the lease does not begin until after the end of the tax year in issue and the lease has a useful life of 18 years. We hold it cannot;

(4) whether the Schanks failed to report taxable flow-through income of $45,175 attributable to a lump-sum prepayment on a lease. We hold they did;

(5) whether Twin City can deduct State taxes for the 2011 fiscal year. We hold that it can; and

(6) whether petitioners are liable for the accuracy-related penalty under section 6662(a) for the tax periods in issue on the grounds of substantial understatements of income tax, or, in the alternative, negligence. We hold that they are.

FINDINGS OF FACT

Some facts have been stipulated. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein, and we find those facts accordingly. At trial the parties agreed that an appeal of these cases would lie in the Court of Appeals for the Eighth Circuit.

[*5] I.     The Schanks

The Schanks resided in Nebraska when they filed their petition. The Schanks were married and filed a joint Form 1040, U.S. Individual Income Tax Return, for tax year 2011. The Schanks are cash method taxpayers using the calendar year for tax reporting.

Both Mr. and Mrs. Schank graduated from high school, but neither attended college. The Schanks have two daughters: Tara Pope and Crystal Palser. Mr. Schank was a hard worker and devoted most of his time to the family roofing business, Twin City. Mrs. Schank worked full time at a local bank in 2011. After a hailstorm in 2010, Mrs. Schank and Mrs. Palser occasionally helped Mr. Schank with his business by taking calls and helping to make estimates, but they were never officially employed by Twin City.

On March 18, 2009, the Schanks organized TMS & P Holdings, LLC (TMS&P), under the laws of Nebraska. TMS&P was a partnership for Federal tax purposes and was a calendar year and cash method taxpayer for the 2011 tax year. The Schanks owned 100% of TMS&P during the tax year 2011. They used TMS&P primarily to rent out some properties to Twin City.

[*6] II.      <u>Twin City</u>

Twin City is a family-owned, closely held C corporation formed under the laws of Nebraska in 1985. Twin City is an accrual method taxpayer. Twin City provides residential and commercial roofing services, as well as pond and agricultural linings.

In the 2011 fiscal year Twin City had 45,000 shares of common stock issued and outstanding that were owned by the Schanks and their daughters as follows: 85% by Mr. Schank and 5% each by Mrs. Schank, Mrs. Pope, and Mrs. Palser. All of the family members sat on Twin City's board of directors and served as corporate officers. However, Mrs. Schank and the daughters did not participate in preparing and approving of corporate tax returns or making decisions on compensation of key employees and officers.

Mr. Schank was employed full time as the president and chief executive officer (CEO) of Twin City starting in 2004. In that capacity Mr. Schank had final decision-making and supervisory power over all business matters, including compensation and tax return preparation and approval. As it often happens in small to medium businesses, Mr. Schank had to be a jack of all trades. Mr. Schank described himself as a perfectionist and explained that because it was difficult for

[*7] him to find employees who could live up to his high expectations, he ended up performing the work of three to four individuals.

In May 2010 a hailstorm hit Nebraska and caused widespread damage to roofs, siding, windows, stucco, and paint. Because of the hailstorm, Twin City's business received a lot more orders and income than usual. As a result, Mr. Schank received wages from Twin City in tax year 2011 of $129,100, consisting of a base salary of $39,900[5] and a bonus of $75,000. Mr. Schank's total reported compensation for the 2011 tax year was more than three times his reported salary in prior years.[6] This was also the first time Twin City paid bonuses.

Twin City never declared a dividend. Petitioners explained that they decided to keep the cash in the business for bonding purposes to get government contracts instead of taking it out as compensation or dividends. The parties stipulated that Twin City had sufficient current earnings and profits to declare a dividend to its shareholders in fiscal year 2011.

---

[5]The parties used $39,900 in their briefs and at trial. However, the difference between the income reported on Form W-2, Wage and Tax Statement, and the $75,000 bonus is $54,100.

[6]In the prior three years Mr. Schank's salary at Twin City was around $40,000. In addition, Twin City paid cash bonuses to Mrs. Schank ($30,000), and Mrs. Pope and Mrs. Palser ($25,000 each) in September 2011.

**[*8] III.**     Twin City's Payments for the Schanks' Personal Expenses

    **A.**     Construction of the Schanks' Personal Residence and the Barn

The Schanks owned a parcel of land (Schanks' land) in Scottsbluff, Nebraska, with the title held by the Terry M. and Paula J. Schank Living Trust. The parcel is zoned for residential use. In the 2011 tax year Twin City paid for materials and labor totaling $328,711.42 in connection with the construction of several structures on the Schanks' land, including a new personal residence for the Schanks, a barn (Morton building), and a structure adjacent to the man made lake.[7]

Charlene Claflin, a secretary-bookkeeper of Twin City, recorded all these expenses in the same manner as other Twin City business expenses, as cost of goods sold. Twin City did not include these amounts on Form W-2 for any of the Schanks, did not pay payroll taxes, and did not record these amounts as compensation for services on its books. Twin City's certified public accountant (C.P.A.), Mr. Miller, later included these expenses in the corporate tax return under cost of goods sold on the basis of information provided to him by Twin City.

---

[7]There is disagreement among the parties as to what portions of the expenses are allocable to the house and to the barn, but we do not need to decide this issue because all of the costs represent personal expenses of the Schanks, as discussed further in this opinion.

[*9]   Petitioners admitted that the costs of constructing a personal residence were erroneously treated as part of the cost of goods sold by Twin City and agreed that the benefit received should be taxable to the Schanks.

The Morton building housed Mr. Schank's office, which he used for both business and personal purposes.  In addition, the Schanks used a part of the building to store their personal vehicles and some Twin City vehicles.  The Schanks once used the Morton building for a corporate picnic.  There was no lease or other written agreement for the title transfer or the use of the Morton building between the Schanks and Twin City.

B.      Payment of Schanks' Credit Card Bills

In the 2011 fiscal year, Twin City paid and reported on its books as cost of goods sold $26,040.55 in personal credit card charges on the Schanks' behalf. Twin City never recorded these amounts as compensation for the Schanks on its books.

C.      Purchase of the Spyder

On July 1, 2011, Twin City paid $17,140 for the purchase of the Spyder.[8] Mr. Schank holds the title to the Spyder in his individual capacity.  He explained

---

[8]We note that this is the date which the parties have stipulated to.  The date is after the end of the 2011 fiscal year for Twin City.

[*10] that this was because Twin City's business insurance would not permit it to insure the Spyder. Mr. Schank also explained that Twin City purchased the Spyder for him to travel between Twin City's worksites. Mr. Schank owned other motorcycles for his personal use.

For the 2011 fiscal year, Twin City claimed $5,484 in depreciation for the Spyder. Petitioners, however, did not produce any records, such as travel logs, maintenance receipts, or other evidence associated with the alleged business use of the Spyder. Twin City did not report the amount paid for the Spyder as compensation to the Schanks.

IV.    Twin City's Rent Payments to TMS&P

TMS&P owned the land on which Twin City operated. Under the terms of the lease agreement between TMS&P and Twin City, Twin City paid a monthly rent of $1,835 for the use of the land. The agreement was for a term of 20 years, from June 25, 2009, through June 25, 2029.

On June 13, 2011, Twin City and TMS&P amended the lease agreement to include additional land. The amendment was for a term of 215 months commencing on July 1, 2011, and continuing through June 2029. Under the terms of the lease amendment, Twin City was to pay to TMS&P a lump-sum prepayment of rent of $45,175 for the entire lease term set to begin on July 1, 2011. Twin City

**[*11]** deducted the lump-sum prepayment of rent to TMS&P on its 2011 fiscal year tax return. However, TMS&P and the Schanks--who owned 100% of TMS&P and to whom the payment should have flowed through-- did not report the prepayment on their respective 2011 tax returns.

V.    Twin City's Bookkeeping Practices and Preparation of Twin City's Federal Corporate Income Tax Return for the 2011 Fiscal Year

Twin City employed Ms. Claflin as a secretary-bookkeeper. Ms. Claflin graduated from high school, but she did not have any formal training in accounting. Her predecessor and a longtime employee of Twin City taught her how to use Twin City's accounting software as well as how to perform other computer-related tasks, such as typing up invoices, purchase orders, proposals, and other business-related documents. Ms. Claflin reported directly to Mr. Schank throughout her employment. Her role in keeping the company books was very limited: Ms. Claflin entered into the accounting system the data from the invoices Mr. Schank left on her desk, prepared the checks for Mr. Schank's signature, and made sure the bills were paid on time. Mr. Schank gave her instructions and provided data for certain entries, including compensation and employee bonuses.

Ms. Claflin understood the difference between personal and business expenses. Many of the purchase orders for materials later used for the

[*12] construction of buildings on the Schanks' land had a note on them reading "Terry's house", and Ms. Claflin understood that these invoices were related to Mr. Schank's personal expenses. Yet she recorded these expenses as Twin City's business expenses because Mr. Schank never communicated to her that she should treat these expenses differently from other Twin City expenses or record them as compensation for his services. The same applied to personal credit card bills.

At some point after respondent began the audit of Twin City's return, Ms. Claflin typed up corporate meeting minutes at the direction of Mr. Schank from his handwritten notes. Ms. Claflin understood that the minutes were backdated. The corporate minutes were never produced at trial.

Ms. Claflin did not participate in the preparation of Twin City's 2011 fiscal year corporate tax return. She only helped an associate of an accounting firm hired for that purpose to get the information out of the company's computer system.

Mr. Miller, a C.P.A. hired by Twin City to prepare its corporate tax returns, has been working with the company in that capacity since 2004. Every year Mr. Miller's firm and Twin City signed a new engagement letter. The engagement letter for the 2011 fiscal year, dated September 13, 2011, stated that Mr. Miller's firm would not perform an independent audit of the data the company submitted

[*13] for the purposes of tax return preparation and would not engage in any activities related to detection and prevention of fraud or other irregularities. Twin City agreed to the terms of the engagement letter.

To prepare the 2011 fiscal year tax return for Twin City, Mr. Miller's associate traveled to Twin City's office, obtained necessary data from the company's accounting system with the help of Ms. Claflin, and prepared a draft tax return. Mr. Miller reviewed the tax return and discussed it with Mr. Schank. Mr. Miller was not aware that Mr. Schank was building a personal residence or that the construction expenses were included in Twin City's cost of goods sold. Mr. Schank never requested Mr. Miller's guidance on the proper reporting of construction costs and credit card bill payments. Neither did Mr. Schank ever discuss with Mr. Miller recording these expenses as Mr. Schank's compensation or potential tax consequences of such reporting.

On September 13, 2011, Mr. Schank signed a tax return control and routing sheet that acknowledged that he reviewed the corporate tax return for the 2011 fiscal year and that he believed the information in the return was in agreement with what Twin City had provided to Mr. Miller. Twin City's tax return did not report expenses related to the Schanks' house, the Morton building, the Spyder, and credit card bill payments as compensation to Mr. Schank.

**[*14]** VI.    <u>Preparation of the Schanks' and TMS&P's Federal Income Tax</u>
<u>Returns for Tax Year 2011</u>

The Schanks retained Mr. Mitchell, an enrolled IRS agent and a co-owner of

a local H&R Block franchise, to prepare their personal Federal income tax return

for the 2011 tax year as well as the Federal tax return for the TMS&P.

Mr. Mitchell had helped the Schanks prepare their personal tax returns since the

end of the 1990s.  He was not involved in the preparation of Twin City's tax

returns.

Typically, Mr. Mitchell prepared tax returns for the Schanks using the

information they provided to him, such as Forms W-2, Forms 1099-MISC,

Miscellaneous Income, and supporting documentation for any itemized

deductions.  In 2011, as in prior years, the Schanks provided Mr. Mitchell with

their Forms W-2 and 1099-MISC and met with Mr. Mitchell for a total of about

two hours to go through the various questions related to personal income tax

return preparation.  Mr. Mitchell did not provide the Schanks with a tax organizer.

Instead, he used the proprietary H&R Block software that provides questions to

ask clients, ranging from specific questions related to last-year reporting positions

to open-ended questions about the current year.  However, he did not verify

[*15] independently information the Schanks provided to him in order to prepare their tax return.

At the time of the 2011 tax return preparation, Mr. Mitchell was aware that the Schanks were planning to sell their old residence, but he was not aware that they were building a new house. The Schanks never solicited any tax advice regarding the treatment of the construction costs of their new residence. The Schanks did not inform Mr. Mitchell of any issues related to additional compensation in 2011.

Mr. Mitchell also prepared the tax return for TMS&P for the 2011 tax year. Again, he prepared the return using the information provided to him by the Schanks. They never raised the issue of receiving a lump-sum prepayment for the lease amendment and did not provide Mr. Mitchell with a copy of the amended lease agreement. As a result, the TMS&P tax return for the 2011 tax year did not contain information about the lump-sum prepayment for the lease, and this payment was not reflected on the Schanks' individual return either.

**[*16]**                                        OPINION

I.      <u>Burden of Proof</u>

Petitioners argue that the burden of proof in these cases should be shifted

pursuant to section 7491(a).  The Commissioner's determinations in a notice of

deficiency are generally presumed to be correct, and the taxpayer bears the burden

of proving by a preponderance of the evidence that the determinations are

incorrect.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Pursuant

to section 7491(a)(1), the burden of proof may shift to the Commissioner with

respect to factual matters if the taxpayer meets certain requirements.  However, a

burden shift under section 7491(a) could have significance only in the rare event

of an evidentiary tie.  <u>Blodgett v. Commissioner</u>, 394 F.3d 1030, 1039 (8th Cir.

2005), <u>aff'g</u> T.C. Memo. 2003-212.  As will be shown, the evidence was not

equally balanced with respect to any of the issues presented, so we decline to rule

on a potential burden shift under section 7491(a).  See <u>Knudsen v. Commissioner</u>,

131 T.C. 185, 189 (2008).

II.     <u>Twin City's Payment of the Schanks' Personal Expenses</u>

During the tax periods in issue Twin City paid the following expenses that

respondent argues are personal: construction costs of the Schanks' house and the

Morton building, personal credit card bills, and the  purchase of the Spyder.

**[\*17]** Respondent argues that these amounts should be treated as a constructive dividend to the Schanks and, thus, nondeductible to Twin City.[9] Respondent also argues that Twin City cannot deduct depreciation for the Spyder because it is personal property of Mr. Schank.[10] Petitioners disagree both as to the nature of some of the expenses and the tax treatment of all of the items. We will first discuss the nature of the expenses in question and then will address their proper tax treatment.

### A.    Nature of Expenses Paid by Twin City

Petitioners admit that they mistakenly reported the house construction expenses on Twin City's books as cost of goods sold, but petitioners argue that the Morton building and the Spyder are capital assets owned by Twin City. Petitioners did not argue in brief or at trial that the credit card payments by Twin City are business expenses. Thus, petitioners waived this argument. See Mendez v. Commissioner, 121 T.C. 308, 313-314 (2003). Respondent's determination that the credit card bills are personal expenses of the Schanks will stand.

---

[9]Twin City did not try to deduct the cost of the Spyder on its 2011 fiscal year tax return as an expense under sec. 162.

[10]We also note that because the parties stipulated that Twin City bought the Spyder on July 1, 2011, after the close of its 2011 fiscal year, Twin City would not be entitled to a depreciation deduction for the Spyder on the 2011 fiscal year tax return anyway.

[*18] At trial and in brief petitioners argued that the Morton building is a storage facility that belongs to Twin City and any expenses related to that facility should be treated as business related. Petitioners claim that they used the facility to store Twin City's vehicles. However, it appears the Schanks also used it to store their personal vehicles. Mr. Schank had one of his offices in the Morton building, and he admitted to using it for both business and personal purposes. The title to the land on which the Morton building was constructed belongs to the Schanks through a living trust. Petitioners did not introduce any documents containing an agreement between the Schanks and Twin City as to the use of the land or the ownership of any structures on that land. The only testimony petitioners introduced on the subject of the Morton building ownership was that of Mr. Schank. Mr. Schank's testimony did not shed any light on the title to the property or other arrangements with Twin City that would allow us to conclude that the building was used for legitimate business purposes. Thus, petitioners failed to meet their burden of proof, and we conclude that the expenses paid by Twin City to construct the Morton building were personal expenses of the Schanks.

Next, petitioners argue that the Spyder is an asset that belongs to Twin City and is used for business purposes, namely, as a means of transportation for Mr. Schank between various Twin City worksites. Respondent argues that because the

[*19] title to the vehicle is in Mr. Schank's name alone and petitioners did not introduce any evidence of the business use of the vehicle such as travel logs detailing date, mileage, and business purpose for the use of the Spyder,[11] it must be a personal expense of the Schanks. Mr. Schank testified at trial that he holds the title to the Spyder only for insurance purposes. We find this explanation unpersuasive in the light of the evidence of title and the complete absence of any evidence besides Mr. Schank's self-serving testimony as to any business-related use of the Spyder. Petitioners failed to meet the burden of proof to show that Twin City purchased the Spyder for business purposes. Thus, respondent prevails on this issue.

---

[11]Although not at issue here, sec. 274(d) provides an example of the substantiation requirements when the business use of an asset is questioned. Sec. 274(d) precludes taking a deduction for expenses incurred while traveling by car unless a taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement the following five elements: the amount, date, time, place, and business purpose of the expense. To meet the adequate records requirement for the expenses enumerated in sec. 274, a taxpayer must maintain an account book, a diary, a log, a statement of expense, trip sheets, or a similar record or documentary evidence which, in combination, would be sufficient to establish each element of expenditure or use. Sec. 1.274-5T(c)(2)(ii)(A), Temporary Income Tax Regs., 50 Fed. Reg. 46017-46018 (Nov. 6, 1985).

**[*20]** To conclude, the expenses Twin City paid for the construction of the Schanks' house, the Morton building, personal credit card bills, and the Spyder are not related to Twin City's business but are personal.

B.    Tax Characterization of the Expenses Paid by Twin City

Gross income includes all income from whatever source derived unless otherwise specifically excluded.  Sec. 61(a).  The definition of gross income broadly includes any instance of undeniable accession to wealth, clearly realized, and over which the taxpayer has complete dominion and control.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  Petitioners concede that the Schanks received income in the form of Twin City's paying their personal expenses and should have reported this income on their 2011 Federal income tax return.

Respondent argues that the income the Schanks received in the form of distribution of corporate property is a constructive dividend.  Petitioners, in turn, argue that the payments should be treated as compensation to Mr. Schank for the prior years of service when he was underpaid.  Under both theories, the Schanks would be required to include the amounts received as ordinary income for the year

**[\*21]** 2011.[12]  However, if petitioners prevail, Twin City may be able to deduct the amounts paid as an ordinary and necessary business expense for reasonable compensation under section 162(a)(1).

Section 162(a)(1) allows a taxpayer to deduct payments for reasonable compensation for services when incurred as ordinary or necessary business expenses during the taxable year.  See sec. 1.162-7(a), Income Tax Regs.  Whether amounts are paid as compensation turns on the factual determination of whether the payor intends at the time that the payment is made to compensate the recipient for the services performed.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 92 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Whitcomb v. Commissioner, 733 F.2d 191, 194 (1st Cir. 1984), aff'g 81 T.C. 505 (1983); Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058 (1972) ("It is now settled law that only if payment is made with the intent to compensate is it deductible as compensation."), aff'd without published opinion, 474 F.2d 1345 (5th Cir. 1973); Elec. & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971) (describing intent to compensate as a condition precedent to characterizing a payment as a compensation), aff'd without published opinion, 496 F.2d 876 (5th Cir. 1974).

---

[12]The Schanks, however, could potentially benefit from the lower rate on qualified dividend income under sec. 1(h)(11).

**[\*22]** This Court has long held that the relevant time for determining the intent is the time when the purported compensation payment is made, not when the Commissioner later challenges the payment's characterization.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 92; Paula Constr. Co. v. Commissioner, 58 T.C. at 1059-1060; Compact Equip. Co. v. Commissioner, T.C. Memo. 1999-409; Drager v. Commissioner, T.C. Memo. 1987-483.  The taxpayer bears the burden of proof as to intent to compensate.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514 (1992).

The record in these cases does not support petitioners' assertion that Twin City intended the payments for the construction of the Schanks' house, the Morton building, credit card bills, and the Spyder to be compensation.  The only evidence petitioners introduced to prove compensatory intent is self-serving testimony of Mr. Schank, Twin City's CEO and the majority shareholder, that he always intended the payments as compensation for his services in prior years.  Petitioners did not introduce into evidence any board resolutions which addressed the payment of compensation to Mr. Schank.  Absent such evidence, we cannot conclude in these cases that a corporation intended an action not reflected in its corporate documents.

[*23] We do not question Mr. Schank's business decision to keep the money in the business instead of paying himself a higher salary. Because of Mr. Schank's efforts, Twin City's business grew substantially--as did Mr. Schank's compensation. However, on our review of the record, we are convinced that the payments in question were not intended as compensation for services at the time they were made. Mr. Schank tacitly approved running the expenses for his personal residence, the Morton building, credit card bills, and the Spyder through the corporate accounts and recording them as cost of goods sold in the accounting software. Twin City did not report these expenses as compensation either on its books or on its tax return for the 2011 fiscal year.[13] Nor did Twin City pay payroll taxes on these amounts. The Schanks did not report these amounts on their tax return at all and did not inform their tax preparer that they considered these payments compensation. The corporate minutes typed up by Ms. Claflin at the instruction of Mr. Schank after respondent began his audit were not introduced as evidence at trial.

---

[13]This distinguishes these cases from Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153. In Mad Auto Wrecking, the taxpayer reported the amounts paid to its owners as compensation at the outset, and the Commissioner later questioned the reasonableness of that compensation. Here, in contrast, it seems that petitioners played the tax audit roulette by trying to hide the expense payments and pay as little tax as possible. For this reason alone, Mad Auto Wrecking is not followed here.

**[\*24]** There is no doubt Mr. Schank is entitled to benefit from his hard work. However, there is also no doubt that it was Mr. Schank's choice to structure the payments in a certain manner. He now must face the tax consequences of his choice, whether contemplated or not. See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). Under the circumstances, we conclude that Twin City did not intend to compensate Mr. Schank for his services at the time it paid the expenses in question. Thus, these amounts are not compensation for prior services and cannot be deducted by Twin City under section 162. In addition, Twin City is not entitled to a depreciation deduction for the Spyder because it is Mr. Schank's personal property and petitioners did not introduce any evidence of the business use of the Spyder.

We now consider whether the payment by Twin City of the Schanks' personal expenses is a constructive dividend. Sections 301 and 316 govern the characterization for Federal tax purposes of a corporate distribution of property to a shareholder. If a distributing corporation has sufficient earnings and profits, the distribution is a dividend, and a shareholder must include it in gross income. Sec. 301(c)(1); see also Boulware v. United States, 552 U.S. 421, 433 (2008). A constructive dividend is a payment or economic benefit conferred by a corporation on one of its shareholders. DKD Enters. v. Commissioner, 685 F.3d 730, 735 (8th

**[\*25]** Cir. 2012), <u>aff'g in part, rev'g in part, and remanding</u> T.C. Memo. 2011-29.

A constructive dividend may arise through a diversion or conversion of corporate

earnings and profits or through corporate payments to third parties at the direction

of shareholders. <u>Sachs v. Commissioner</u>, 277 F.2d 879, 882 (8th Cir. 1960), <u>aff'g</u>

32 T.C. 815 (1959). Whether corporate expenditures constitute a constructive

dividend is a question of fact. <u>DKD Enters. v. Commissioner</u>, 685 F.3d at 735.

The amount of the constructive dividend is equal to the fair market value of the

benefits received. <u>Challenge Mfg. Co. v. Commissioner</u>, 37 T.C. 650, 663 (1962).

The parties stipulated that Twin City had sufficient earnings and profits to

declare a dividend to its shareholders.[14] Because Mr. Schank, as Twin City's CEO

and majority shareholder, had the ultimate control over the corporate dealings, he

was able to divert corporate funds to pay his personal expenses. Moreover, he

---

[14]Although the parties did not stipulate the exact amount of current and accumulated earnings and profits, we note that the current earnings and profits would necessarily increase by the amount of disallowed deductions for the expenses Twin City paid on behalf of the Schanks. <u>See</u> the discussion <u>supra</u> part II.B. Because distributions which diminish current earnings during the year are to be disregarded in computing the amount of earnings available for dividend distributions, <u>see</u> <u>Baker v. United States</u>, 460 F.2d 827, 835 (8th Cir. 1972), Twin City had sufficient earnings and profits to pay a dividend in the amount respondent determined. Alternatively, because the notice of deficiency issued to the Schanks states that the amounts in question are a dividend and petitioners failed to disprove this determination, we could uphold respondent's determination on this ground.

[*26] approved the payment of those expenses out of the corporate funds. These facts fit squarely into the definition of a constructive dividend.

In conclusion, we sustain respondent's determination that Twin City's payments for the construction of the Schanks' personal residence, the Morton building, credit card bills, and the Spyder are constructive dividends to Mr. Schank.

III.    Prepayment of Rent to TMS&P

Respondent argues that Twin City improperly deducted a lump-sum prepayment of rent to TMS&P on its 2011 fiscal year tax return because Twin City is an accrual method taxpayer and should have capitalized the prepaid lease expenses. Petitioners argue that Twin City is entitled to deduct the prepayment under the related-party provisions of section 267.

Whether a taxpayer is required to capitalize an expense depends on whether the expense is an ordinary and necessary business expense as defined by section 162(a) or a capital expenditure covered by section 263. The reason behind the need to distinguish between currently deductible expenses and those that are subject to capitalization is "to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes." INDOPCO, Inc. v. Commissioner,

[*27] 503 U.S. 79, 84 (1992).  The critical consideration in determining whether an expense should be treated as a capital expenditure is whether the expenditure produces a benefit to a taxpayer that extends substantially beyond the tax year. U.S. Freightways Corp. v. Commissioner, 270 F.3d 1137, 1140 (7th Cir. 2001), rev'g 113 T.C. 329 (1999); secs. 1.263(a)-2, 1.461-1(a)(2), Income Tax Regs. Courts have repeatedly held that a prepayment of rent for a lease with a duration over one year is a capital asset subject to amortization over the period of the lease. Univ. Props., Inc. v. Commissioner, 378 F.2d 83, 84 (9th Cir. 1967), aff'g 45 T.C. 416 (1966); Cooper Found. v. O'Malley, 221 F.2d 279, 280 (8th Cir. 1955); Main & McKinney Bldg. Co. of Hous., Tex. v. Commissioner, 113 F.2d 81, 81-82 (5th Cir. 1940); Baton Coal Co. v. Commissioner, 51 F.2d 469 (3d Cir. 1931), aff'g 19 B.T.A. 169 (1930).  In Univ. Props., the Court of Appeals for the Ninth Circuit held that where a lessee of a tract of land entered into a supplemental lease agreement adding new land to the tract covered by the old lease, lump-sum prepayments for the additional land were capital expenditures amortizable over the period of the full lease.

Here, similar to the parties in Univ. Props., Twin City and TMS&P entered into an amended lease for the additional land adjacent to the tract covered by the existing lease.  The parties signed the lease amendment on June 13, 2011, with the

[*28] lease expiring sometime in June 2029. Pursuant to the lease amendment, at some point in 2011 Twin City prepaid the full amount of additional rent for the next 18 years, $45,175. This payment, together with the payments under the old lease, constitutes consideration for the lease and must be capitalized under section 263 and amortized over the entire lease period.

Additionally, Twin City received the right to use the land under the amended lease on July 1, 2011, after the close of its 2011 fiscal year. For accrual method taxpayers, the "all events test" determines when an expense is deductible. Sec. 1.446-1(c)(1)(ii)(B), Income Tax Regs. The all events test requires that the liability be clearly established, the amount of an expense be reasonably determinable, and economic performance have occurred. Id. Economic performance under a lease occurs ratably over the period the taxpayer is entitled to the use of the property. Id. sec. 1.461-4(d)(3). Thus, because the economic performance under the lease did not begin until after the end of the 2011 fiscal year, Twin City cannot deduct the lease prepayment for that year.

Next, we address petitioners' argument that Twin City was entitled to a deduction for its 2011 fiscal year under the provisions of section 267. Petitioners argue that because TMS&P and the Schanks should have included the rent

[*29] prepayment in income on the day it was made, Twin City should be allowed a matching deduction for the same tax year.[15]

Section 267(a)(2) provides that a taxpayer must defer deductions for amounts payable to a related person until the amount is includable in the recipient's gross income. As a prerequisite to the application of the section 267 rules, a taxpayer must be able to currently deduct an expense under another Code section, such as section 162 or 212. See sec. 267(a)(2) (flush language); sec. 1.267(a)-1(b)(1), Income Tax Regs. ("No deduction shall be allowed a taxpayer for trade or business expenses otherwise deductible under section 162, for expenses for production of income otherwise deductible under section 212 [.]").

There is no dispute that Twin City and TMS&P are related parties under section 267(b)(2). However, because we held that Twin City cannot deduct the lump-sum rent prepayment under section 162 and should instead capitalize it

_____

[15]Petitioners did not introduce any evidence as to the exact date of the payment. When a taxpayer does not offer evidence or testimony as to essential facts at issue while having an opportunity to do so, it can weigh against him. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986) (citing Blum v. Commissioner, 59 T.C. 436, 440-441 (1972)). We refuse to assume in the absence of any evidence that Twin City made the prepayment under the amendment to the lease agreement before the end of its 2011 fiscal year, or that the Schanks or TMS&P must have included it in income on a date before June 20, 2011. We note that neither the Schanks or TMS&P reported the alleged prepayment on their tax returns for 2011. For that reason alone, petitioners' argument under sec. 267 fails.

**[\*30]** under section 263, we do not need to discuss the matching rules application in these cases. The section 267(a)(2) rules are not intended to and do not allow otherwise impermissible deductions. Accordingly, we sustain respondent's determination that the rent prepayment under the amended lease is not deductible by Twin City for the 2011 fiscal year and should instead be treated as a capital expenditure amortizable ratably over the full term of the lease.

IV.     Unreported Income to the Schanks From the Prepayment of Rent to TMS&P

The Schanks did not challenge in their petition or in brief respondent's determination in their notice of deficiency that they did not report income in the amount of the prepayment of rent to TMS&P.[16] Thus, we deem this argument abandoned. Mendes v. Commissioner, 121 T.C. at 313-314.

V.     Twin City's Deduction of State Taxes

The issue of the State tax deduction arose because of petitioners' confusion as to what expenses respondent disallowed in Twin City's notice of deficiency. Petitioners argue in their opening brief that they are entitled to deduct $41,586 in Nebraska State income taxes reported on Twin City's Federal tax return for the 2011 fiscal year. Because respondent never disallowed that deduction in Twin

---

[16]Instead, petitioners' argument on the applicability of sec. 267 matching rules to the rent prepayment implies that the Schanks indeed received said prepayment sometime in 2011.

**[*31]** City's notice of deficiency and did not affirmatively raise this issue as a new matter during the litigation, we need not and do not address that argument further.

VI.    Section 6662(a) Penalty

Section 6662(a) imposes a 20% accuracy-related penalty on the underpayment of tax required to be shown on a return. Any portion of an underpayment which is attributable to negligence or disregard of rules or regulations or a substantial understatement of income tax is subject to the accuracy-related penalty. Sec. 6662(b)(1) and (2).

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code or to exercise ordinary and reasonable care in the preparation of an income tax return. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes any failure to maintain adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard includes any careless, reckless or intentional disregard of the rules or regulations. Id. subpara. (2).

The Schanks diverted corporate funds to pay their personal expenses while claiming an improper deduction for those expenses at the corporate level and not reporting additional income on their personal tax return. Mr. Schank, a self-described perfectionist, entrusted bookkeeping for Twin City to a high school

[*32] graduate with no formal accounting training. The Twin City bookkeeper entered personal expenses as attributable to cost of goods sold with the tacit approval of her direct supervisor and the company CEO, Mr. Schank. These facts show that petitioners did not make a reasonable attempt to comply with the provisions of the Code or to exercise ordinary and reasonable care in the preparation of their tax returns. Accordingly, we conclude that respondent met his burden of production under section 7491(c) and that petitioners were negligent with respect to any underpayment of tax for the periods in issue.

For individuals, a substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). For corporations, an understatement is substantial when it exceeds the lesser of 10% of the tax required to be shown on the return or $10 million. Sec. 6662(d)(1)(B). Here, these amounts are as follows:

| Petitioner | Amount of tax shown on the return | Amount of tax required to be shown | 10% of Tax required to be shown | Understatement |
|---|---|---|---|---|
| The Schanks | $30,910 | $113,378 | $11,337.80 | $82,468 |
| Twin City | 87,534 | 286,090 | 28,609 | 198,556 |

**[\*33]** The understatement amounts here are attributable to the issues covered in this opinion and concessions by petitioners in the stipulation of facts. Accordingly, respondent has met his burden of production under section 7491(c), and petitioners' understatements of income tax are substantial within the meaning of section 6662(d)(1)(A) and (B).

Once the Commissioner has met the burden of production, the taxpayer must come forward with persuasive evidence that the imposition of a penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith in relying on advice of a competent tax professional. Sec. 6664(c)(1); United States v. Boyle, 469 U.S. 241 (1985); Neonatology Assocs., P.A. v. Commissioner; 115 T.C. at 98; sec. 1.6664-4(b)(1), (c), Income Tax Regs. To prove that reliance on advice of a tax professional constitutes reasonable cause, the taxpayer must prove by a preponderance of the evidence that he or she meets the following three requirements: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

[*34] Petitioners agree that they incorrectly reported certain items on their respective tax returns but blame inaccuracies on the errors made by their accountants. The record shows, however, that petitioners failed to provide their tax advisers with the necessary and accurate information to prepare correct tax returns. Mr. Schank never discussed with Mr. Miller the issues of correct reporting of personal expenses on the corporate books or tax returns. The Schanks also did not discuss any additional compensation or the lump-sum lease prepayment to TMS&P with their personal tax preparer, Mr. Mitchell. The terms of engagement for both Mr. Miller and Mr. Mitchell did not imply they would independently verify the statements petitioners provided to them. When a taxpayer does not request tax advice on an issue and fails to provide the facts as to that issue to a tax professional, a taxpayer necessarily fails the Neonatology test. Petitioners cannot push the responsibility for allegedly erroneous tax reporting on to their accountants when the errors are solely of their own making. Thus, we sustain respondent's determination of the penalty under section 6662(a).

VII. Conclusion

We have considered all of the arguments that petitioners made, and to the extent not discussed above, conclude that those arguments are irrelevant, moot, or

**[*35]** without merit.  We have considered respondent's arguments only to the extent stated herein.

To reflect the foregoing and concessions by petitioners,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.