T.C. Memo. 2018-131

UNITED STATES TAX COURT

PACIFIC MANAGEMENT GROUP, BSC LEASING, INC., TAX MATTERS PARTNER, ET AL.,[1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6411-07, 6412-07,
6413-07, 6414-07,
6494-07, 6498-07,
6499-07, 6592-07,
6593-07, 6594-07,
6596-07.

Filed August 20, 2018.

_____

[1]Cases of the following petitioners are consolidated herewith: Cory M. Severson and Rochelle Severson, docket No. 6412-07; Pacific Aquascape International, Inc., docket No. 6413-07; Pacific Environmental Resources, Corp., docket No. 6414-07; Mark E. Krebs and Janet B. Krebs, docket No. 6494-07; Johan A. Perslow and Marie Majkgard Perslow, docket No. 6498-07; Pacific Aquascape, Inc., docket No. 6499-07; Curtis Hartwell, docket No. 6592-07; Pacific Advanced Civil Engineering, Inc., docket No. 6593-07; Richard F. Boultinghouse and Loraine Boultinghouse, docket No. 6594-07; and Johan A. Perslow, docket No. 6596-07.

**[*2]**  Ernest Scribner Ryder, Richard V. Vermazen, and Alvah Lavar Taylor, for

petitioners.

Kevin W. Coy, Heather K. McCluskey, Hans Famularo, and Jeffrey L.

Heinkel, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LAUBER, Judge:  These consolidated cases involve a complex tax shelter

scheme featuring four C corporations, five individual shareholder-employees of

the C corporations, five employee stock ownership plans (ESOPs), five S corpora-

tions, and (inevitably) a partnership.  This scheme was devised by Ernest S. Ryder,

who serves as co-counsel for petitioners in these cases.[2]  The scheme relied in part

on section 1361(c)(6),[3] effective for tax years after 1997, which allowed ESOPs to

---

[2]Tax Court Rule 24(g) provides that "[i]f any counsel of record * * * is a
potential witness in a case, then such counsel must * * * withdraw from the case
* * * or take whatever other steps are necessary to obviate a conflict of interest."
We ruled before trial that Mr. Ryder would not be required to withdraw, provided
that the entire trial was conducted by Mr. Vermazen, his co-counsel, who does not
have a conflict of interest.  Neither party called Mr. Ryder as a witness during the
trial.

[3]Unless otherwise noted, all statutory references are to the Internal Revenue
Code (Code) in effect for the years at issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  We round all monetary amounts to the

(continued...)

[*3] be shareholders of S corporations.  See Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 1316(a), 110 Stat. at 1785.

Reduced to its essentials, the scheme worked as follows.  The partnership extracted cash from the C corporations in the form of alleged "factoring fees" and "management fees."  The C corporations claimed deductions for these payments, wiping out substantial portions of their taxable income.

The partnership distributed much of this cash to its five partners, each of which was an S corporation formed by one of the five individuals.  The distributions to each S corporation were made ratably on the basis of the corresponding individual's ownership interest in the C corporations.  Each individual received from his S corporation a salary, in whatever amount he believed necessary to support his anticipated living expenses.  The individuals reported those amounts as taxable income; the S corporations retained the rest of the cash and (after paying certain expenses) invested it for the individuals' benefit.

All of the stock of each S corporation was owned by an ESOP.  The sole participant in (and beneficiary of) each ESOP was the individual who had formed the S corporation.  Because the ESOPs were tax exempt, the distributions the S

_____

[3](...continued)
nearest dollar.

[*4] corporations received from the partnership (net of the salaries and benefits paid to the individuals) were purportedly exempt from current Federal income taxation. The desired end result, therefore, was largely to eliminate taxation of the operating profits at the C corporation level and defer indefinitely any taxation of those profits at the individual shareholder level, even though the profits had been distributed ratably for each shareholder's benefit.

Rightly concluding that this scheme was too good to be true, the Internal Revenue Service (IRS or respondent) attacked it on numerous grounds for tax years that (owing to calender and fiscal year differences) span 2002-2005. We hold that the "factoring fees" and most of the "management fees" were not deductible expenses of the C corporations but rather were disguised distributions of corporate profits. To the extent set forth below, we hold that these distributions were currently taxable to the individual shareholders of the C corporations as constructive dividends or as income improperly assigned to the S corporations.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. The record of these consolidated cases, including the trial transcript, the stipulations of facts, and the attached exhibits, totals many thousands of pages.

**[\*5]** Rule 151(e)(3) requires that a party provide, for each proposed finding of fact, "references to the pages of the transcript or the exhibits or other sources relied upon to support the statement." Respondent's proposed findings of fact, occupying 140 pages of his opening brief, comply with this requirement. Petitioners' proposed findings of fact, occupying 96 pages of their opening brief, frequently do not. Where facts are in doubt, we have done our best to locate support for petitioners' version. But we have resolved uncertain matters in favor of respondent where petitioners have failed to support with record citations their proposed findings of fact. See 535 Ramona Inc. v. Commissioner, 135 T.C. 353, 359-360 (2010); Brewer Quality Homes, Inc. v. Commissioner, T.C. Memo. 2003-200, 86 T.C.M. (CCH) 29, 30 n.3.

Implementation of the tax shelter scheme entailed many thousands of cash transfers among 15 entities and individuals. In their proposed findings of fact the parties often do not agree on the net results of these transactions, or even on what the dollar amounts remaining in dispute actually are. We have done our best to work our way through this fog. We leave it to the parties' Rule 155 computations to determine the final tax consequences of our redeterminations.

**[\*6]** A.     <u>The Water Companies and Their Shareholders</u>

The four C corporations whose tax liabilities are at issue are Pacific Aquascape, Inc. (PAQ), Pacific Aquascape International, Inc. (PAI), Pacific Advanced Civil Engineering (PACE), and Pacific Environmental Resources Corp. (PERC). We will sometimes refer to the C corporations collectively as the Water Companies.  Each of the Water Companies had its principal place of business in California when it filed its petition.

The stock of the Water Companies was owned by five individuals:  Johan Perslow, Cory Severson, Mark E. Krebs, Curtis S. Hartwell, and Richard Boultinghouse.  Some of them filed joint returns for certain years at issue; all ensuing references to individuals with these surnames are to petitioner husbands.  We will sometimes refer to each petitioner husband as a "principal" of the Water Companies and refer to them collectively as the "five principals."  All individual petitioners resided in California when they filed their petitions.

B.     <u>Business Structure and Operations Before 2000</u>

The story begins with PAQ, which was formed in November 1987 by Mr. Perslow and Mr. Severson after a predecessor business, Pacific Lining Co., went bankrupt.  PAQ's work initially related chiefly to golf course development but later expanded to include designing, engineering, and constructing various aquatic

[*7] environments, including manmade lakes, waterfalls, streams, pools, and spas. PAQ had between 30 and 45 full-time employees in 1999 and added other workers as its projects required. As of December 31, 1999, PAQ's officers and share-holders were as follows (percentages do not total 100% because of rounding):

| Individual | Office | % Ownership |
| --- | --- | --- |
| Perslow | Chairman/Secretary | 41.0 |
| Severson | President/Treasurer | 26.8 |
| Krebs | Vice president | 20.1 |
| Hartwell | Vice president | 8.0 |
| Boultinghouse | CFO | 4.0 |

PACE was originally a division of PAQ, functioning as its in-house engineering design group. It was separately incorporated in 1994 with the same ownership structure as PAQ. PACE specialized in designing water resource systems, including flood control systems, wastewater systems, and recreational water features. PACE did most of its design work for projects on which PAQ performed construction. Its workforce grew from 30 employees in 1994 to 70 employees in 2001. Its clientele correspondingly expanded from small land developers to include cities and counties throughout the southwestern United States, as well as major national developers. As of December 31, 1999, PACE's officers and shareholders were as follows:

[*8]

| Individual | Office | % Ownership |
|---|---|---|
| Perslow | Chairman/Secretary | 41.0 |
| Severson | President/Treasurer | 26.8 |
| Krebs | Vice president | 20.1 |
| Hartwell | Vice president | 8.0 |
| Boultinghouse | CFO | 4.0 |

PAI was incorporated in 1996 to perform in Nevada and Utah the same types of construction and engineering services that PAQ performed in California. Initially PAI had its own employees, who also worked on PAQ projects. PAI's employees were later put on PAQ's payroll, and PAI reimbursed PAQ for employee time spent on PAI projects. Mr. Perslow had no nominal ownership interest in PAI because of complications caused by a prior bankruptcy. PAI's profits nevertheless appear to have been distributed roughly on the basis of the five principals' ownership interests in PAQ and PACE.

PERC was incorporated in 1998 to provide services as a general contractor for the other three companies. PERC arose out of PAQ's need for wastewater treatment plants to ensure that its water systems were algae free. PERC was also the entity that bore the costs of any liability associated with the Water Companies' design and construction of wastewater treatment plants. PERC had 10 employees

[*9] in 2001, and its headcount tripled during the ensuing six years. As of December 31, 1999, PERC's officers and shareholders were as follows:

| Individual | Office | % Ownership |
|---|---|---|
| Perslow | Chairman | 79.9 |
| Severson | President | 10.6 |
| Krebs | --- | 7.9 |
| Boultinghouse | CFO | 1.6 |

The Water Companies were all organized as C corporations during the tax years at issue, apparently because Mr. Perslow's status as a foreign national made the S corporation structure unavailable. See sec. 1361(b)(1)(C). Although each company had its own website, the four functioned in most respects as a single integrated entity. They shared office space and overhead costs, used the same accounting and administrative staff, and used the same IT personnel and email system.

Sherry Quarry, who began working for the Water Companies in 1994, managed the corporate ledgers, made payments on accounts payable, and prepared client invoices. Two or more companies often worked on the same client project. The accounting software enabled her to generate debits and credits for cross-company services, whereby each company would be charged expenses in propor-

**[*10]** tion to the services it consumed. These expenses included (among other things) employee wages and benefits, rent payments, and overhead and facility costs.

Before 2000 Mr. Perslow was employed and paid by PERC, Mr. Severson and Mr. Hartwell were employed and paid by PAQ, and Mr. Krebs and Mr. Boultinghouse were employed and paid by PACE. The employing company was then reimbursed by the other Water Companies for the time its employee devoted to the other companies' assignments. Before 2000 the Water Companies had a bonus program for staff employees and a separate bonus pool for the five principals, who received bonuses only if the companies had sufficient cashflow. Petitioners submitted no evidence to establish, for years before 2000, the amounts of the bonuses the five principals received, the manner in which those bonuses were determined, or the ratio of their bonuses to their basic pay.

The Water Companies experienced substantial growth between 1990 and 1999. Their aggregate revenues increased from approximately $3 million to more than $20 million during this period. They doubled their employee count during these years.

[*11] C.   Business Structure and Operations After 1999

By 1999 the Water Companies had multi-million-dollar contracts with numerous landowners.  Although they and their shareholders were prospering, they were unhappy that operating income was subject to tax separately at the corporate and shareholder levels.  Like many taxpayers during those boom years, they sought professional advice in search of a solution to this perceived problem.

In August 1999 the five principals were introduced to Mr. Ryder, whose practice focused on employee benefit plans.  He specialized in creating tax structures that purportedly enabled shareholder-employees to defer taxation of a substantial portion of their income, free of the normal limitations on contributions to qualified retirement plans, and pay tax only on income needed to defray current living expenses.  The balance of the income would accumulate in a retirement account or tax-free entity and remain tax deferred until the owners elected to take distributions.

Mr. Ryder proposed two related strategies designed to minimize the tax liabilities of the C corporations and maximize tax-deferred income for the five principals.  He proposed an "employee leasing/deferred compensation plan" involving a newly created S corporation for each of the five principals.  All of the stock of each S corporation would be owned by an ESOP whose sole participant would be

**[*12]** that principal. He also proposed an "accounts receivable factoring" program.

Under Mr. Ryder's scheme, a partnership would extract cash from the C corporations in the form of alleged "management fees" and "factoring fees," thus eliminating most of the Water Companies' taxable income. The partnership would transfer this cash to (or for the benefit of) the S corporations, ratably to each principal's approximate percentage ownership interest in the C corporations. Each principal would receive (and pay tax on) a salary from his S corporation. But most of the cash would accumulate tax free in the five S corporations because all of the stock of each was owned by an ESOP, a tax-exempt entity.

The five principals formally engaged Mr. Ryder's services in October 1999. He agreed to design a structure that would achieve petitioners' tax goals by creating "5 corporations, 5 ESOPs, 2 or more Partnerships, 2 or more Management Service Agreements, and 2 or More Master Factoring Arrangements." He agreed to supply an opinion letter on the purported validity of the structure and represent petitioners should the structure be challenged by the IRS. As compensation for his efforts, the Water Companies agreed to pay Mr. Ryder a $50,000 documentation fee and an annual fee computed as 6.33% of "the income earned by the S corporations that is not subject to immediate taxation."

**[*13]** 1.     Documents and Agreements Underlying the Tax-Minimization Plan

In October 1999 Mr. Ryder formed (and elected S-status for) a new "one-man" corporation for each of the five principals. We will refer to these entities as Perslow Inc., Severson Inc., Krebs Inc., Hartwell Inc., and Boultinghouse Inc., and collectively as the S corporations. Each S corporation had the same address as the Water Companies.

Each S corporation sponsored an ESOP. The sole participant in (and beneficiary of) each ESOP was the principal for whom the S corporation had been formed. During the tax years at issue, each ESOP owned 100% of the stock of its sponsoring S corporation.[4]

Each principal purportedly executed with his S corporation an "agreement of employment" by which he agreed to furnish services as an employee. The agreements did not specify what positions the principals were to hold or what duties they were to perform. Rather, the agreements simply recited that each principal would "render and perform services under the direction and designation of" his respective S corporation. The agreements entitled each principal to receive "base monthly compensation" and also to receive additional compensation, if

---

[4]The record contains no documentary evidence concerning the tax treatment of the five ESOPs. However, respondent has not challenged their validity and does not dispute that the IRS originally recognized their tax-exempt status.

[*14] authorized by the S corporation, in relation to the principal's "individual productivity and services to, and longevity with," the S corporation.

On November 1, 1999, Mr. Ryder formed two California general partnerships, Pacific Management Group (sometimes referred to as Pacific Management Co.) (PMG) and PERC Management Group. The two partnerships merged, purportedly on January 1, 2000, with PMG as the surviving entity. (The evidence at trial established that the merger agreement was created on September 30, 2002, and backdated to January 1, 2000.) For ease of reference we will refer to both partnerships as PMG for all years.

The partners in PMG, all denominated general partners, were the S corporations. Four of the S corporations were partners from the outset. Hartwell Inc. was added as a partner on January 1, 2001, and received an 8.02% interest. At that time PMG had capital accounts of $2,642,296. Thus, Hartwell Inc. should have made an initial capital contribution in excess of $200,000. In fact, it made a capital contribution of $87.

Each S corporation's percentage interest in PMG approximated the corresponding principal's aggregate ownership interest in the C corporations.[5] To en-

---

[5]The five principals held (or regarded themselves as holding) identical ownership interests in PAQ, PAI, and PACE but different ownership interests in

(continued...)

[*15] sure that each S corporation's interest in PMG continued to approximate its respective principal's ownership percentage in the Water Companies, the S corporations entered into mutual buy/sell agreements. As reflected on the Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., included in PMG's partnership tax returns, the S corporations as of December 31, 2002, had the following percentage ownership interests in PMG (amounts do not total 100% because of rounding):

| S Corporation | % Interest |
|---|---|
| Perslow Inc. | 38.6 |
| Severson Inc. | 27.6 |
| Krebs Inc. | 21.0 |
| Hartwell Inc. | 7.6 |
| Boultinghouse Inc. | 5.3 |

The partnership agreement stated that the "primary purpose of the partnership is to provide business, management, and financial services to clients of the Partnership." To enable PMG to do this, each S corporation agreed to supply

---

[5](...continued)
PERC. Each S corporation's ownership interest in PERC Management Group, before it merged with PMG, was determined by the corresponding principal's ownership interest in PERC. After PERC Management Group merged into PMG, the S corporations' ownership interests in PMG were adjusted accordingly.

[*16] PMG with the services of its "employee." The partnership agreement stated that each S corporation would also devote, through its principal, "whatever time and attention is necessary to manage and conduct the business of the Partnership."

On November 15, 1999, PMG supposedly entered into Independent Contractor Agreements for Management Services (ICAs) with the Water Companies. Under the ICAs, PMG (denominated the "consultant") agreed to supply to the Water Companies (denominated the "client") the "management services" that the five principals supplied to PMG. These "management services" consisted of substantially the same services that the five principals had previously performed for the Water Companies directly as its officers and employees. These services included "design, engineering and construction services," "construction management services," and "value engineering." All services were to be performed on site at the Water Companies' office in Huntington Beach.

The ICAs stated that PMG would issue monthly invoices to the Water Companies for "management fees" in exchange for the services the five principals supplied. These management fees took the form of "base monthly compensation" plus "discretionary bonuses." The ICAs nominally entitled PMG to render management services to clients other than the Water Companies, but there is no

[*17] evidence in the record that PMG ever did this (or that the parties ever intended that PMG would do this).[6]

The Water Companies (except PERC) entered into "Master Factoring Agreements" (MFAs) with PMG with a supposed effective date of November 15, 1999. "Factoring" is a financial transaction by which one party (the factor) provides services to another party (the client) and is compensated by payment of factoring fees. The services that the factor provides typically include: (1) purchasing the client's accounts receivable for cash, (2) collecting on the accounts receivable from the account debtors, and (3) assuming the downside risk if an account debtor becomes insolvent. Factoring benefits the client by enabling it to monetize an illiquid asset immediately. In exchange for its services the factor receives a fee, typically computed as a discount from the face amount of the receivables.

The Water Companies had never investigated factoring as a financial tool before they met Mr. Ryder. Before adopting his "factoring" proposal, they did not

---

[6]The base compensation the five principals received during 2002-2005 substantially exceeded the base compensation specified in the ICAs, as most recently amended in 2000. In 2006, during the IRS audit, Mr. Ryder's firm prepared new employment agreements (and corresponding corporate action documents) reciting the higher amounts of base compensation, then backdated all of those documents to the relevant prior years.

[*18] investigate the availability or the cost of factoring with banks or financial institutions. Boultinghouse admitted to Ms. Quarry that the main purpose of the factoring arrangement was tax deferral.

Under the MFAs, PMG purportedly purchased from the Water Companies (except PERC) accounts receivable that they assigned to it. Because PMG had virtually no capital--the total capital contributed by its five partners was $2,087--it initially lacked the funds necessary to purchase the receivables. It thus deferred its alleged "factoring" activity until it had received sufficient "management fees" from the Water Companies.

PMG began its alleged factoring activity in October 2000. It earned "factoring fees" equal to the difference between the face amount of the receivables and its discounted purchase price. None of the factoring agreements specified what discount would be applied. The discounts in fact applied were 5%, 4%, and 4% for PACE, PAI, and PAQ, respectively. Boultinghouse apparently picked these rates after making inquiries to several banks about "typical" rates. The factoring agreements included the following terms:

- The Water Companies would sell the accounts receivable to PMG on a nonrecourse basis, with title passing to PMG.

[*19] • PMG would purchase the accounts receivable and remit payment to the Water Companies as soon as the assignment of the receivables was completed.

• Funds collected on accounts receivable would be deposited into a bank account titled in PMG's name. PMG accepted the risk of loss for non-collectible accounts. However, the Water Companies were to act as collection agents for PMG, with PMG supposedly reimbursing the Water Companies for the collection services provided by their employees.

• The Water Companies would provide PMG with security interests in their present and future accounts receivable (but in no other assets).

• The Water Companies would not notify their clients (the account debtors) that the accounts were being sold to PMG.

2.     Operations Under the Tax-Minimization Plan

The implementation of Mr. Ryder's tax-minimization strategy caused no change in how the Water Companies conducted their business or related to the outside world. All present and future clients executed contracts with the Water Companies as they had done previously. The five principals retained their pre-existing titles as officers of the Water Companies, and clients continued to interact with them as they had done before.

Boultinghouse (for example) had previously been the CFO of all four Water Companies. Under Mr. Ryder's tax structure, Boultinghouse remained the CFO of all four companies, and he continued to provide them with exactly the same finan-cial and accounting services he had supplied previously. But now he supplied

**[\*20]** those services as an "employee" of his S corporation, which allegedly supplied his services to PMG, which allegedly supplied his services as an "independent contractor" to the Water Companies.

Water Company clients were not aware of PMG's existence and engaged in no business activity with it. PMG had no employees, no telephone system, no email address, and no website. Its books and records were kept by Water Company employees, including Sherry Quarry, who also ran payroll for the S corporations. The Water Companies' accounting systems remained the same as previously. All Water Company employees, including the five principals, recorded their time on timesheets exactly as they had done before. When recording time, each principal input a project code to indicate the Water Company to which his time should be billed.[7]

The changes wrought by Mr. Ryder's tax-minimization strategy occurred mostly on paper or in the form of electronic transactions. PMG's receipts, in the form of "management fees" and "factoring fees," were separated into three pools:

---

[7]In 2002 PMG supposedly became the lessee of the building that housed the Water Companies. The five principals signed the lease on behalf of PMG; the lease made them personally liable for the rent payments. PMG then subleased the building back to PACE, and PACE reimbursed PMG for the rent owed to the lessor. The evidence at trial established that the sublease agreements (and related corporate action documents) were created in 2006 and backdated to 2002.

**[*21]** Pool A-1 (performance bonuses), Pool A-2 (shareholder bonuses), and Pool B (working capital). Allocations to Pools A-1 and A-2 were determined according to a percentage of the Water Companies' "normalized" profits. "Normalized" profits were calculated by adding back to the Water Companies' reported profits the "factoring fees" and "management fees" paid to PMG, as well as interest expenses. These allocations were split 50-50 between the two pools. The remainder of PMG's receipts were routed into Pool B. The Water Companies could (whenever necessary) access funds in these pools to pay their expenses, typically through a loan or a revolving line of credit.

PMG used the profits in Pools A-1 and A-2 to make distributions to the S corporations, which were made in two tranches. The first tranche consisted of "guaranteed payments." These payments were generally made monthly and corresponded to the "base monthly compensation" due to the five principals under the ICAs. The "guaranteed payments" that PMG made to the S corporations during the tax years at issue were as follows:

| S Corporation | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Perslow Inc. | $234,000 | $229,500 | $282,000 | $585,503 |
| Severson Inc. | 195,000 | 203,000 | 274,000 | 430,850 |
| Krebs Inc. | 168,000 | 175,000 | 233,750 | 342,700 |

[*22] Hartwell Inc. 134,000 125,000 137,200 200,650

Boultinghouse Inc. 148,000 135,700 164,200 370,750

Total 879,500 868,200 1,091,150 1,930,453

Out of these distributions the S corporations paid salaries to the five principals, reimbursed the Water Companies for health insurance provided to the those individuals and their families, and paid certain other expenses. The S corporations provided each principal with Forms W-2, Wage and Tax Statement, reporting the salary amounts after withholding applicable employment taxes. The Form W-2 wages the five principals received from their S corporations for the tax years at issue were as follows:

| Principal | 2002 | 2003 | 2004 | 2005 |
|-----------|------|------|------|------|
| Perslow | $182,400 | $330,807 | $220,512 | $336,736 |
| Severson | 167,100 | -0- | 205,678 | 215,168 |
| Krebs | 94,800 | 98,000 | 121,059 | 188,855 |
| Hartwell | 97,941 | 113,440 | 119,788 | 111,487 |
| Boultinghouse | 69,126 | 69,440 | 71,157 | 77,513 |
| Total | 611,367 | 611,687 | 738,194 | 929,759 |

The second tranche of distributions that PMG made to the S corporations consisted of "bonuses." These distributions were made intermittently, often at the

[*23] time bonuses were paid to the Water Companies' rank and file employees.

PMG made bonus distributions to the S corporations as follows:

| S Corporation | 2003 | 2004 | 2005 |
|---|---|---|---|
| Perslow Inc. | $148,672 | $8,500 | $117,350 |
| Severson Inc. | 52,500 | 69,000 | 77,200 |
| Krebs Inc. | 112,500 | 39,500 | 72,600 |
| Hartwell Inc. | 12,000 | 19,500 | 17,500 |
| Boultinghouse Inc. | -0- | 10,000 | 13,000 |
| Total | 325,672 | 146,500 | 297,650 |

All PMG receipts not distributed to the S corporations were credited to their respective partner capital accounts. As reported on PMG's tax returns, the partners' capital accounts on January 1 of each year were as follows:

| S Corporation | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Perslow Inc. | $1,424,320 | $1,755,840 | $1,837,759 | $2,321,438 |
| Severson Inc. | 996,896 | 1,254,745 | 1,453,492 | 2,058,336 |
| Krebs Inc. | 754,564 | 957,161 | 1,083,328 | 1,843,808 |
| Hartwell Inc. | 260,896 | 343,776 | 395,243 | 502,376 |
| Boultinghouse Inc. | 195,117 | 241,162 | 292,749 | 49,524 |
| Total | 3,631,793 | 4,552,684 | 5,062,571 | 7,075,482 |

All PMG receipts not distributed to the five principals currently were retained and invested for their benefit in accounts titled in the names of the S corporations.

[*24] Pursuant to the MFAs, PMG nominally purchased from PAQ, PAI, and PACE during the tax years at issue aggregate accounts receivable as follows:

| Year | A/R Purchased |
|------|---------------|
| 2002 | $18,444,093 |
| 2003 | 18,803,741 |
| 2004 | 24,106,198 |
| 2005 | 32,740,968 |

The total "factoring fees" that PMG received from PAQ, PAI, and PACE in exchange for its alleged services exceeded $3.5 million for these four years.

The actual operation of PMG's "factoring" activity differed in important respects from the manner in which factoring is typically conducted by financial institutions. In a typical factoring arrangement, the factor assumes responsibility for collecting the purchased accounts. Under the PMG arrangement, by contrast, the Water Companies were to act as "collection agents" for PMG, the supposed factor. This was apparently done because the Water Companies did not wish their clients to know that their accounts had been "sold."

PMG was given a security interest in the Water Companies' accounts receivable. Contrary to normal "factoring" practice, however, PMG did not perfect its security interest by a Uniform Commercial Code (UCC) filing. Again, this was

**[\*25]** evidently because the Water Companies did not wish their clients to know that their accounts had been "sold."

Both before and after implementation of the supposed "factoring" arrangement, Mr. Boultinghouse, in his capacity as CFO, was directly responsible for collecting on the Water Companies' accounts, including past-due accounts. If accounts became delinquent, Mr. Boultinghouse would direct the Water Companies' employees to telephone clients to ascertain the expected payment date. If accounts remained delinquent, he would direct project managers or other high-level employees to contact the clients. If accounts became seriously delinquent, he would consult with the staff of the Water Companies to determine whether mechanics liens should be filed or a collection agency retained.

The MFAs stipulated that PMG would "reimburse" the Water Companies for these collection services. But there is no evidence in the record that such reimbursements were ever made. Nor is there any evidence about the manner in which such reimbursements were supposed to have been calculated.

The actual operation of the supposed "factoring" activity also departed in several respects from the terms specified in the MFAs. PMG often made payments on accounts receivable before the Water Companies had executed forms assigning those accounts to PMG or verified the outstanding balances on the

[*26] accounts. This was contrary to the terms of the agreements and to accepted factoring practice.

PMG often paid in installments for the accounts it "purchased," rather than paying the entire purchase price to the Water Companies up front. In some cases payment was made in seven or eight installments spread over many months. This was contrary to the terms of the agreements and to standard factoring practice, whose goal is to provide the client with immediate liquidity. The evidence established that the timing of the supposed "factoring" payments was dictated, not by the terms of the MFAs, but by "when there was money in the bank to do it," as Ms. Quarry testified.

While factoring receivables theoretically enabled the Water Companies to accelerate their incoming cashflow, this benefit was illusory given how the "factoring" operated. PMG could not function as a "factor" without the management fees it received from the Water Companies, as shown by the 10-month delay in PMG's commencement of "factoring." See supra p. 17-18. In effect, the Water Companies had to provide working capital to PMG (rather than the other way around) to enable PMG to purchase the accounts receivable. Given this circular flow of funds, the "factoring" generated no liquidity benefits for the Water Companies.

[*27] The "factoring" arrangement between PMG and the Water Companies was insufficient to support the Water Companies' working capital needs, chiefly because of the large "management fees" they were paying to PMG. Consequently, the Water Companies each established lines of credit with PMG on which they could draw to fund their operations during the years at issue. The Water Companies also borrowed regularly from each other as needed.

D.     Transition to a New Structure After 2005

Mr. Ryder informed the principals that the structure outlined above would no longer provide preferential tax treatment as of November 30, 2005, because Congress had amended the Code to prohibit single-participant ESOPs. See Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, sec. 656(d)(1), 115 Stat. at 135 (codified as section 409(p)); Rev. Rul. 2003-6, 2003-1 C.B. 286.[8] He accordingly advised that the existing ESOPs should be phased out and that new ESOPs would need to have more than 10 participants.

On the basis of Mr. Ryder's advice the principals formed and elected S status for a new company, Water Speciality Group (WSG); formed new ESOPs inten-

---

[8]Congress provided that the amendment codified as section 409(p) generally would apply to plan years beginning after December 31, 2004. The ESOPs had a plan year beginning December 1, 1999, with the result that the amendment would apply to their plan years beginning December 1, 2005.

[*28] ded to comply with the legislative amendment; and solicited other employees of the Water Companies to be "plan participants" in the newly formed ESOPs. WSG, its affiliated entities, and numerous individuals were petitioners in cases at 29 docket numbers that were originally consolidated with the 11 cases currently before the Court. On October 14, 2015, the parties filed a stipulation of settled issues that resolved all issues with respect to the WSG structure for taxable years 2006-2011, and decisions in those 29 cases have been entered.[9]

E.     Tax Returns and IRS Examination for 2002-2005

The Water Companies timely filed Forms 1120, U.S. Corporation Income Tax Return, for 2002-2005, on which they claimed deductions for (among other things) the "management fees" and "factoring fees" paid to PMG. PMG timely filed Forms 1065, U.S. Return of Partnership Income, for 2002-2005 and issued Schedules K-1 to the S corporations. The five principals timely filed (in some cases jointly) Forms 1040, U.S. Individual Income Tax Return, for 2002-2005, on which they reported the salaries they received from their S corporations and nominal payments from the Water Companies. It is unclear what the latter payments covered.

---

[9]A list of the docket numbers for the cases that were settled appears in Appendix A. See infra p. 78.

[*29] The IRS selected all of these returns for examination. It determined numerous adjustments and issued notices of deficiency to the Water Companies, notices of deficiency to the five principals, and a notice of final partnership administrative adjustment (FPAA) to PMG. The parties have conceded or settled a variety of issues.[10] Respondent has also made partial concessions on certain of the issues that remain in dispute. The issues remaining in dispute, with dollar amounts adjusted to reflect partial concessions, are as follows:

• With respect to the four C corporations, the IRS allowed deductions for the portions of the "management fees" corresponding to the Form W-2 wages received by the five principals. It disallowed deductions for the balance of the "management fees" and for the totality of the "factoring fees." The claimed deductions were disallowed on various alternative grounds, including failure to satisfy the requirements of section 162, lack of economic substance, and lack of arm's-length pricing under section 482. After concessions (some of which

---

[10]A description of the issues the parties have settled or explicitly conceded, by docket number, appears in Appendix B. See infra pp. 79-80. Petitioners did not challenge at trial or in their post-trial briefs any of the accuracy-related penalties that the IRS determined. The penalties are therefore deemed conceded to the extent we determine deficiencies. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Schladweiler v. Commissioner, T.C. Memo. 2000-351, aff'd, 28 F. App'x 602 (8th Cir. 2002).

**[*30]** reflected math errors), the adjustments remaining in dispute appear to be as follows:[11]

## Disallowed Management Fees

| Company | Year/Period | Amount |
|---------|-------------|--------|
| PERC | 9/30/2002 | $30,360 |
| | 9/30/2003 | -0- |
| | 9/30/2004 | -0- |
| | 9/30/2005 | -0- |
| PACE | 12/31/2002 | 157,349 |
| | 12/31/2003 | 319,234 |
| | 12/31/2004 | 1,361,427 |
| | 12/31/2005 | 2,081,138 |
| PAQ | 6/30/2003 | 19,464 |
| | 6/30/2004 | 23,216 |
| | 6/30/2005 | 10,756 |
| PAI | 3/31/2003 | 24,077 |
| | 3/31/2004 | 25,178 |
| | 3/31/2005 | 25,473 |

---

[11]Respondent has stipulated that any changes to the Water Companies' ultimate tax liabilities will need to be apportioned under sections 1561-1563. We leave those apportionments to the parties' Rule 155 computations.

[*31]                        Disallowed Factoring Fees

| Company | Year/Period | Amount |
|---------|-------------|--------|
| PACE | 12/31/2002 | $350,834 |
| | 12/31/2003 | 292,230 |
| | 12/31/2004 | 456,487 |
| | 12/31/2005 | 612,605 |
| PAQ | 6/30/2003 | 505,930 |
| | 6/30/2004 | 511,930 |
| | 6/30/2005 | 619,395 |
| PAI | 3/31/2003 | 43,463 |
| | 3/31/2004 | 79,756 |
| | 3/31/2005 | 28,182 |

• With respect to the individual petitioners, the IRS determined that disallowance of deductions for the corporate payments listed above generated taxable income for the five principals, either as constructive dividends or on another theory (assignment of income, lack of economic substance, or lack of arm's-length pricing under section 482). After concessions, the amounts of individual taxable income remaining in dispute appear to be as follows:

| Principal | 2002 | 2003 | 2004 | 2005 |
|-----------|------|------|------|------|
| Perslow | $30,664 | $23,488 | $46,928 | $350,207 |
| Severson | 1,056 | 18,969 | 122,477 | 259,259 |

**[*32]**

| | | | | |
|---|---|---|---|---|
| Krebs | 61,164 | 173,075 | 137,688 | 217,748 |
| Hartwell | 21,436 | 26,405 | 37,404 | 86,203 |
| Boultinghouse | -0- | -0- | -0- | 304,205 |

• With respect to PMG the IRS made the following alternative adjustments: (1) increased its ordinary income by disallowing deductions for various expenses and distributions to the S corporations; (2) disregarded, for lack of economic substance, the S corporations and any transactions entered into between them and PMG; and (3) determined that the principals were PMG's actual partners.

OPINION

I.   Burden of Proof

The IRS' determinations in a notice of deficiency or an FPAA are generally presumed correct, and taxpayers bear the burden of proving them erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deductions claimed and of substantiating the amounts underlying claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); sec. 1.6001-1(a), Income Tax Regs. Generally, a taxpayer may deduct ordinary and necessary business expenses

**[\*33]** paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a). Whether an expense constitutes an "ordinary and necessary" expense within the meaning of section 162 generally presents a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

Under section 7491(a), the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any relevant factual issue and meets other requirements. Petitioners have not argued that section 7491(a) applies and have not shown that they meet the requirements to shift the burden of proof. The burden of proof thus remains on them.

II.    Jurisdiction

We must first address two jurisdictional questions. Four months after post-trial briefing concluded, petitioners moved to dismiss for lack of jurisdiction with respect to PMG and the four C corporations.[12] This Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent authorized by Congress. Sec. 7442; Naftel v. Commissioner, 85 T.C. 527, 529 (1985). When a jurisdictional question is raised, we must address it before deciding the case. Stewart v. Commissioner, 127 T.C. 109, 112 (2006).

---

[12]The relevant docket numbers are 6411-07 (PMG), 6413-07 (PAI), 6414-07 (PERC), 6499-07 (PAQ), and 6593-07 (PACE).

**[\*34]** This Court generally has jurisdiction over a partnership-level case under section 6226 if: (1) the IRS issues a valid FPAA and (2) the TMP or another eligible partner timely files a petition with this Court relating to the FPAA. Rule 240; see Harbor Cove Marina Partners P'ship v. Commissioner, 123 T.C. 64, 78 (2004). The IRS issued a timely FPAA to PMG on December 28, 2006, and the TMP timely petitioned this Court on March 19, 2007.

This Court generally has jurisdiction over a deficiency case under section 6213 if: (1) the IRS issues the taxpayer a valid notice of deficiency and (2) the taxpayer timely petitions this Court. Rule 13(a), (c); see Monge v. Commissioner, 93 T.C. 22, 27 (1989); Normac, Inc. v. Commissioner, 90 T.C. 142, 147 (1988). The IRS issued timely notices of deficiency to the Water Companies on December 15 and 21, 2006, and they timely petitioned this Court.

A.     Partnership Case

With respect to PMG, a TEFRA partnership, petitioners assert that the IRS failed to issue to each notice partner a timely notice of the beginning of an administrative proceeding (NBAP), as provided in section 6223(a) and (d). This failure, according to petitioners, allowed PMG's partners--namely the five S corporations--to "opt out" of the TEFRA proceeding and convert the partnership items to non-partnership items under section 6223(e)(3)(B). Petitioners contend that these

[*35] elections deprive the Court of jurisdiction over the partnership case because there are no partnership items left for us to adjudicate. See sec. 6226(f).

We note at the outset that an untimely NBAP does not invalidate the FPAA to which it relates. See Bedrosian v. Commissioner, 143 T.C. 83, 95 (2014) (stating that the Commissioner's failure to adhere to the 120-day timeframe means that the NBAP is untimely but does not invalidate either notice); Wind Energy Tech. Assocs. III v. Commissioner, 94 T.C. 787, 791-794 (1990); sec. 301.6223(e)-2(a), Proced. & Admin. Regs. Thus, any failure by the IRS to issue timely NBAPs to the notice partners did not prevent it from issuing a valid FPAA to PMG and BSC Leasing, Inc., the partnership's TMP.[13]

The IRS issued to PMG and its TMP, on December 28, 2006, a valid FPAA for 2002-2005. For tax year 2003 the record establishes that the IRS sent NBAPs to each notice partner more than 120 days before December 28, 2006. Thus, no partners were eligible to opt out for 2003, and this Court has jurisdiction over PMG for that year.

For tax years 2002 and 2004, the record establishes that the IRS issued an NBAP to BSC Leasing, Inc., the partnership's TMP, on April 6, 2006. That date

---

[13]BSC Leasing, Inc., the one-man S corporation for Mr. Boultinghouse, is also referred to in this opinion as Boultinghouse, Inc.

**[*36]** was more than 120 days before the date on which the IRS issued the FPAA. Regardless of whether other partners successfully opted out, there are partnership items for us to adjudicate because at least one partner remains. We therefore have jurisdiction over PMG for 2002 and 2004.

For tax year 2005 the parties agree that all five of PMG's partners, including BSC Leasing., Inc., effectively elected out of the TEFRA proceeding. Although the TMP filed a valid petition,[14] it appears that we lack jurisdiction over PMG's 2005 year because there remain no partnership items left to adjudicate.

In seeking to have the PMG case dismissed, petitioners may be suggesting a backdoor statute of limitations argument to prevent the Court from determining the validity of certain transactions to which PMG was a nominal party. If the IRS mails an FPAA to the TMP, and if a partner opts out of the TEFRA proceeding under section 6223(e)(3), then the period of limitations on assessment as to that partner does not expire before one year after the partnership items are converted to nonpartnership items. See sec. 6229(d), (f) (cross-referencing section 6231(b)).

---

[14]Electing out of the TEFRA proceeding did not preclude BSC Leasing, Inc., from filing a petition with the Court relating to the FPAA. Under section 301.6231(a)(7)-1(l), Proced. & Admin. Regs., the filing of an opt-out election by a TMP is not listed among the actions that terminate a TMP designation.

[*37] All of PMG's partners are S corporations which (as flow-through entities) could not receive notices of deficiency. The taxable parties are the five individuals who are alter egos of the S corporations. Concurrently with mailing the FPAA, the IRS mailed notices of deficiency to all five individuals. Thus, even if the partnership items were deemed to have become nonpartnership items, notices of deficiency were mailed to the five principals while the assessment period of limitations remained open. See ibid.

None of the five principals was a partner (directly or indirectly) in PMG. See Watkins v. Commissioner, T.C. Memo. 2014-197, 108 T.C.M. (CCH) 337, 338 (stating that individuals cannot be indirect partners in a partnership by virtue of their being participants in ESOPs that hold shares in S corporations holding partnership interests). Petitioners do not dispute that the IRS issued timely notices of deficiency to the five principals and to the four C corporations. All of the adjustments we sustain in these cases are to the income tax liabilities of the five principals and the four C corporations. All of them are properly subject to our jurisdiction.

Since dismissal of the PMG proceeding would have no effect on our determinations and would not seem to help petitioners, the motion to dismiss as to PMG appears to have been improvidently filed. We nevertheless must decide

[*38] what to do with this motion. BSC Leasing, Inc., the partnership's TMP, filed a timely petition under section 6226(a) as to all four years. For 2002-2004, partnership items remain for at least one partner, so we have jurisdiction with respect to the FPAA for those years. Because all the partners appear to have opted out for 2005, no partnership items remain for us to adjudicate, so we appear to lack jurisdiction with respect to the FPAA for 2005. We shall therefore deny petitioners' motion to dismiss the PMG case with respect to 2002-2004 and grant the motion with respect to 2005. We reiterate that this has no effect on our jurisdiction to decide the substantive tax liabilities at issue in these cases, because all of the adjustments we sustain are to the income tax liabilities of the five principals and the four C corporations, which are properly before us in the deficiency cases over which we have jurisdiction.

B.    Water Company Cases

Petitioners contend that the notices of deficiency issued to the four C corporations--PAQ, PAI, PACE, and PERC--are invalid in part. That is assertedly so because the notices relate to matters that must be adjudicated in a partnership-level proceeding, e.g., the economic substance of PMG and the economic substance of transactions between the Water Companies and PMG. Alternatively, petitioners contend that the notices of deficiency include affected items, see sec. 6231(a)(5),

[*39] and are invalid because they were issued before the related TEFRA proceeding was concluded.

We find that the notices of deficiency issued to the Water Companies are valid and that we have jurisdiction to adjudicate all items therein. In each notice of deficiency the IRS determined that the deductions claimed by the C corporation for "management fees" and "factoring fees" should be disallowed on one or more grounds, including lack of substantiation, lack of economic substance, failure to constitute "ordinary and necessary" expenses under section 162, and failure to reflect arm's-length pricing under section 482. Petitioners are correct that the question whether PMG as an entity lacks economic substance is a partnership-level item. See Napoliello v. Commissioner, 655 F.3d 1060, 1065 (9th Cir. 2011), aff'g T.C. Memo. 2009-104. But that question is entirely separate from the questions presented by the notices of deficiency issued to the Water Companies. Whether payments made by the Water Companies qualify for deduction under section 162 is a question properly determined in these deficiency proceedings because the answer to that question will determine whether the Water Companies correctly reported their taxable income.

We likewise reject petitioners' contention that the notices of deficiency issued to the Water Companies include "affected items." The C corporations are not

**[\*40]** partners in PMG. The notices issued to them therefore cannot possibly include affected items. See sec. 6231(a)(5) ("The term 'affected item' means any item to the extent such item is affected by a partnership item."). We will accordingly deny petitioners' motions to dismiss in docket Nos. 6413-07, 6414-07, 6499-07, and 6593-07.

III.    Deductions Claimed by the Water Companies

Section 162(a)(1) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," including a "reasonable allowance for salaries or other compensation for personal services actually rendered." An expense is ordinary if it is customary or usual within a particular trade, business, or industry or relates to a common or frequent transaction in the type of business involved. See Deputy v. du Pont, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful to the operation of the taxpayer's business. See Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), aff'd, 777 F.2d 662 (11th Cir. 1985).

A.    "Factoring Fees"

When the five principals met with Mr. Ryder in 1999, he explained that his "factoring program would enable the Water Companies to convert a portion of

[*41] their regular monthly business income into profits of a tax-free factoring entity that could be accumulated for retirement." We conclude that the purported factoring arrangement with PMG had no economic substance but was a device to extract profits from the Water Companies in the guise of tax-deductible payments. The Water Companies derived no economic benefit from this arrangement, and the factoring fees they paid were not "ordinary and necessary" expenses of their business. See sec. 162(a).

As courts have often stated, the substance of a transaction controls over its form. See Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Cooper v. Commissioner, 877 F.3d 1086, 1091 (9th Cir. 2017). The U.S. Court of Appeals for the Ninth Circuit "generally applies a two-pronged inquiry addressing the objective nature of the transaction (whether it has economic substance beyond tax benefits) and the subjective motivation of the taxpayer (whether the taxpayer had a non-tax business purpose for the transaction)." Reddam v. Commissioner, 755 F.3d 1051, 1057 (9th Cir. 2014), aff'g T.C. Memo. 2012-106. "[T]he economic substance doctrine is not a 'rigid two-step analysis,' * * * but instead focuses holistically on whether 'the transaction had any practical economic effects'" other than creation of tax benefits. Id. at 1060 (first quoting Sacks v. Commissioner, 69

[*42] F.3d 982, 988 (9th Cir. 1995), rev'g T.C. Memo. 1992-596, then quoting

Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988)).

Respondent offered, and the Court recognized, Robert Zadek as an expert in

factoring.  Mr. Zadek has extensive experience with factoring arrangements,

having worked in the industry for more than 50 years.  He operates his own

factoring company, Lenders Funding.  It provides factoring services to third-party

clients and has a $37 million factoring portfolio.  We found Mr. Zadek to be a

knowledgeable and credible witness.

Mr. Zadek opined that the factoring arrangement between PMG and the

Water Companies departed in many respects from arm's-length factoring norms.

He first noted that the Water Companies, before embracing Mr. Ryder's proposal,

did no due diligence to investigate the costs and benefits of factoring.  They did

not compare the cost of factoring to the cost of securing working capital via bank

loans.  They did no comparison shopping to ascertain whether more advantageous

factoring terms could be obtained from an independent company.  And they did

not bother to calculate the economic cost of the arrangement Mr. Ryder proposed.

Mr. Zadek determined that the factoring fees the Water Companies paid (4%

or 5% of the receivables' face value), coupled with the expected turnaround time

for collection, yielded an effective annual percentage rate (APR) of 52%.  He con-

[*43] cluded that this rate was at the high end of (or above) the range of APRs that independent factors would have charged. The five principals' insensitivity to price suggests that their true objective was not to obtain low-cost working capital for the Water Companies but rather (as Mr. Ryder proposed) to "convert a portion of their regular monthly business income into profits of a tax-free factoring entity."

In an arm's-length factoring arrangement, the factor typically: (1) receives an assignment of accounts receivable from the client, (2) verifies the genuineness of the accounts and balances shown, and (3) immediately pays the client a lump sum equal to the face amount of the receivables less the agreed-upon discount. Mr. Zadek observed that PMG's payment practices were erratic and regularly flouted these norms. On some occasions PMG would make payment before receiving executed assignments of the receivables and without verifying the account balances. On other occasions PMG would not make the stipulated upfront payment but would instead pay for the receivables in installments, sometimes in seven or eight tranches spread over many months. This was contrary to standard factoring practice, which aims to provide the client with immediate liquidity. The trial evidence supported Mr. Zadek's conclusion that the timing of the supposed

[*44] "factoring" payments was largely dictated, not by the terms of the MFAs, but by "when there was money in the bank to do it," as Ms. Quarry testified.

Mr. Zadek pointed to other aspects of the factoring arrangement in concluding that it did not comply with arm's-length norms. Contrary to usual factoring practice, PMG received a lien only against the accounts receivable themselves, to the exclusion of any other assets of the Water Companies. PMG did not perfect even this limited security interest by a UCC filing, so that its supposed lien would have been ineffective against any of the Water Companies' secured creditors. Nor did the Water Companies provide notification rights that would have enabled PMG to inform the Water Companies' clients that their accounts had been assigned to it for collection.

In a typical factoring arrangement the factor assumes responsibility for collecting the accounts that have been assigned to it. Under the PMG arrangement, by contrast, the Water Companies were to act as "collection agents" for PMG, the supposed factor. This was apparently done because the Water Companies did not wish their clients to know that their accounts had been "sold."

Both before and after implementation of the supposed "factoring" arrangement, Mr. Boultinghouse, in his capacity as CFO, was directly responsible for collecting the Water Companies' accounts receivable, including past-due accounts. If

[*45] accounts became delinquent, Mr. Boultinghouse would direct the Water Companies' employees to telephone clients to ascertain the expected payment date. If accounts remained delinquent, he would direct project managers or other high-level employees to contact the clients. If accounts became seriously delinquent, he would consult with the staff of the Water Companies to determine whether mechanics liens should be filed or a collection agency retained.

The MFAs stipulated that PMG would "reimburse" the Water Companies for these collection services. But there is no evidence in the record that such reimbursements were ever made. Nor is there any evidence to establish how such reimbursements were supposed to have been calculated. Notwithstanding the "factoring" arrangement, the Water Companies remained 100% responsible for collection activity and bore 100% of the costs of collection. They thus derived no benefits from the "factoring" arrangement in this respect.

As Mr. Zadek aptly noted, the factoring arrangement likewise conferred no liquidity benefits on the Water Companies. PMG, the supposed factor, initially had no meaningful capital; the total capital contributed by its five partners was only $2,087. Because lack of capital prevented it from engaging in "factoring" for the first 10 months of its existence, it did not start "factoring" until October 2000,

**[*46]** by which time it had received sufficient "management fees" from the Water Companies to supply it with the requisite cash.

In a true factoring relationship, the factor supplies working capital and liquidity to the client. Here the opposite was true: The client provided working capital to the factor to enable the factor to do the factoring. There is no factual basis whatever for petitioners' assertion that the factoring arrangement "facilitated working capital." The scheme was a circular flow of funds whereby the Water Companies supplied liquidity to themselves.[15]

Petitioners contend that the factoring arrangement had economic substance for three reasons. First, they contend that PMG received actual title to the accounts. Petitioners' paperwork, however, was extremely lax; many documents were backdated; and PMG made no UCC filings with respect to the receivables. It is thus unclear from the record whether title to the receivables actually passed to PMG. Even if title to some receivables did pass to PMG on some occasions, mere passage of title does not imbue transactions with economic substance, especially

---

[15]In further support of his conclusion that the "factoring" arrangement provided no working capital benefits, Mr. Zadek noted that the Water Companies engaged in substantial inter-company lending before the PMG structure was created and continued to engage in substantial inter-company lending even after the factoring arrangement was put in place.

[*47] where the transactions occur between related parties. See, e.g., Feldman v. Commissioner, 779 F.3d 448, 456 (7th Cir. 2015), aff'g T.C. Memo. 2011-297.[16]

Second, petitioners contend that the Water Companies received cash payments from PMG more rapidly than they would have received payment from the account debtors in the absence of factoring. This was not always true: In some instances, PMG paid the Water Companies in installments over many months. In any event, the Water Companies supplied PMG with the cash to make these payments. Had the Water Companies truly desired to conserve working capital, they would simply have held on to this cash, as well as to the $3.5 million in cash they wasted by paying bogus "factoring fees" to PMG.

Third, petitioners contend that PMG suffered the risk of loss for non-collectible accounts. Petitioners did not establish the required factual basis for this argument, because the record does not show that actual title to the accounts vested in PMG to start with. See supra p. 46. In any event, because the Water Companies (as opposed to PMG) were responsible for actual collection of the accounts, the true risk of noncollection fell on them. Since the entire scheme was a circular

---

[16]Petitioners err in citing Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981), to support their position. We there held that transactions in which taxpayers purportedly purchased cattle were not true sales and lacked sufficient substance, apart from tax manipulation, to be recognized for Federal tax purposes.

**[*48]** flow of funds, it does not matter on which entity's books particular losses were formally recorded.

Petitioners rely on the rebuttal report of Brett Solomon to support the economic substance of the "factoring" arrangement. He there asserts that: (1) the factoring arrangement facilitated meaningful working capital financing; (2) PMG's factoring rate was reasonable relative to similar arm's-length transactions; and (3) the factoring arrangement had sufficient formalities to be respected, making allowances for its status as a related-party transaction.

We recognized Mr. Solomon as an expert in general financing arrangements, particularly with reference to the management fees that the Water Companies claimed as deductions. See infra pp. 50-51. Mr. Solomon has no particular expertise in factoring, and we found this portion of his rebuttal report unpersuasive. First, as explained above, the factoring arrangement provided no meaningful working capital financing to the Water Companies because they supplied the cash that enabled PMG to "factor." Second, we found credible Mr. Zadek's testimony that the APR paid by the Water Companies was not an arm's-length rate but was at the high end of (or above) the range of APRs that independent factors would have charged. Third, the essential defect of the factoring scheme was not the lack of formalities (though it was extremely deficient in that

[*49] respect).  Its central defect was that the Water Companies paid out $3.5 million but received no meaningful economic benefit in return.

For these reasons, we conclude that the purported factoring arrangement had no economic substance.  In an objective sense, it provided no economic benefit to the Water Companies beyond the tax benefits they hoped to achieve by disguising as deductible payments what were actually distributions of corporate profits.  See Reddam, 755 F.3d at 1057.  In a subjective sense, the arrangement lacked econom-ic substance because the five principals had no "non-tax business purpose for the transaction."  Ibid.  Their sole purpose was the one Mr. Ryder had urged when pitching his factoring scheme to them, viz, to "enable the Water Companies to convert a portion of their regular monthly business income into profits of a tax-free factoring entity that could be accumulated for retirement."[17]

Even if the Water Companies were deemed to have derived some marginal economic benefit from the factoring arrangement, petitioners have not shown that

---

[17]Petitioners cite various authorities to support their contention that the fac-toring arrangement had economic substance, including section 864(d) ("Treatment of related person factoring income"), Rev. Rul. 66-98, 1966-1 C.B. 200, and sev-eral private letter rulings (PLRs).  All of this material is irrelevant.  Section 864(d) addresses when related party factoring income should be treated as subpart F in-come earned by a controlled foreign corporation.  Revenue Ruling 66-98 refers to dividends from cooperatives.  And the PLRs, which are not precedential, see sec. 6110(k)(3), do not address related-party factoring arrangements.

[*50] the fees they paid were "ordinary and necessary" expenses under section 162. Assuming arguendo that factoring were regarded as customary or "ordinary" within their industry, petitioners have failed to prove that expending $3.5 million for this purpose was "appropriate and helpful" to the operation of the Water Companies' businesses. See Tellier, 383 U.S. at 689; Carbine, 83 T.C. at 363. Nor have they substantiated what lesser amount would have satisfied this test. Petitioners have thus failed to carry their burden of proof. See INDOPCO, Inc., 503 U.S. at 84.[18]

### B. Management Fees

In form, the Water Companies paid management fees to PMG. PMG was a paper entity, and its partners--the five S corporations--were likewise paper entities. Neither PMG nor the S corporations provided the Water Companies with actual management services of any kind. Rather, they were simply vehicles for supplying the personal services of the five principals, who performed for the Water Companies during 2002-2005 essentially the same services they had performed as direct employees of the Water Companies previously. In assessing the reasonableness of the "management fees," therefore, the question is whether

---

[18]Given our disposition, we need not address respondent's alternative contentions that the factoring fees should be reallocated under section 482 and that the factoring arrangement was a loan between the Water Companies and PMG.

[*51] those sums represented reasonable compensation for the personal services rendered by five principals or instead represented (at least in part) nondeductible distributions of corporate profits.

Whether compensation for personal services is reasonable is a question of fact determined on the basis of all the facts and circumstances. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), aff'g T.C. Memo. 1971-200; Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), aff'g T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), aff'd, 965 F.2d 1038 (11th Cir. 1992); sec. 1.162-7(a), Income Tax Regs. "The reasonableness concept has particular significance in determining whether payments between related parties * * * represent ordinary and necessary expenses." Fuhrman v. Commissioner, T.C. Memo. 2011-236, 102 T.C.M. (CCH) 347, 348. Petitioners bear the burden of proving the reasonableness of the compensation paid. See Rule 142(a).

The Court of Appeals for the Ninth Circuit, the appellate venue in these cases absent stipulation to the contrary, applies five factors to determine the reasonableness of compensation: (1) the employee's role in the company, (2) a comparison of the employee's salary with salaries paid by similar companies for similar services, (3) the character and condition of the company, (4) potential con-

[*52] flicts of interest, and (5) the internal consistency of the company's compensation arrangement. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1247 (9th Cir. 1983), rev'g and remanding T.C. Memo. 1980-282. The Ninth Circuit also considers whether the amounts paid would be regarded as reasonable by a hypothetical independent investor. See Metro Leasing & Dev. Corp. v. Commissioner, 376 F.3d 1015, 1019 (9th Cir. 2004), aff'g 119 T.C. 8 (2002); Elliotts Inc., 716 F.2d at 1247 ("If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement.").

Respondent has allowed deductions for some of the management fees, as reported by the S corporations on Forms W-2 issued to the five principals. See supra p. 22. Deductions for these amounts having been allowed, the disallowed management fee deductions consist of "additional base monthly compensation" and "bonuses" paid by PACE. In his post-trial briefs, respondent did not challenge the former, and we find that he has conceded PACE's entitlement to deductions for additional base monthly compensation of $19,234 for 2003, $111,427 for

**[\*53]** 2004, and $16,138 for 2005. The management fees that remain in dispute are thus the bonuses paid by PACE, as follows:[19]

| Year | Bonuses Paid |
|------|--------------|
| 2003 | $300,000 |
| 2004 | 1,250,000 |
| 2005 | 2,065,000 |

Respondent advances several arguments against the deductibility of these bonus payments, including lack of economic substance and reallocation under section 482. We will decide this issue on the basis of respondent's third alternative contention, namely, that the bonus payments constituted unreasonable compensation for services rendered by the five principals and hence were not "ordinary and necessary" business expenses under section 162.

Both parties introduced expert testimony that addressed this question. Respondent offered, and the Court recognized, J.T. Atkins as an expert in valuation, financial analysis, and customary business practices. He has worked in investment banking for more than 29 years and currently heads an advisory firm specializing in mergers, acquisitions, and restructurings. He has performed dozens of

---

[19]PERC paid a bonus of $20,316 in 2004. Because the notice of deficiency did not disallow any management fee deductions claimed by PERC for 2004, we need not further discuss that payment.

[*54] corporate valuations, chiefly involving companies with revenues of less than $200 million. We found Mr. Atkins to be a knowledgeable and credible witness.

Respondent retained Mr. Atkins to determine the values of the Water Companies during the years at issue and to determine whether the management fees paid to PMG represented reasonable compensation. Employing familiar valuation techniques,[20] Mr. Atkins determined year-end valuations for PACE as follows:

| Year | Value |
|------|-------|
| 2003 | $3,912,834 |
| 2004 | 15,522,233 |
| 2005 | 26,499,388 |

Mr. Atkins evaluated the Water Companies' profitability and bonus payments against data from similarly situated companies using Zweig White survey information.[21] He determined that the Water Companies frequently ranked in the

---

[20]Mr. Atkins valued PACE using a "comparable company EBITDA multiple analysis," a widely used valuation technique. He first determined an earnings multiple for a group of comparable publicly traded companies, then applied a discount to calculate an earnings multiple for PACE. He applied that multiple to PACE's annual EBITDA (earnings before interest, taxes, depreciation, and amortization) before bonuses to determine its FMV each year.

[21]Mr. Atkins explained that Zweig White is "an organization that tracks annual surveys of more than 175 firms" to derive data concerning "the financial performance of firms in the engineering, architecture, and environmental consulting industry."

[*55] top quartile of comparable companies for revenue growth but in the bottom quartile for pretax profit. With respect to PACE in particular, he determined that it ranked in the top quartile of similarly situated companies for revenue growth, the top quartile for bonus payments, but the bottom quartile for pretax, after-bonus profit. He concluded that this inconsistency resulted mainly from the extremely high management fees paid to PMG. As a corollary of this determination he concluded that the five principals, in their capacity as shareholders of the Water Companies, received returns on their equity investment that were abnormally low.

Mr. Atkins noted that the Water Companies' gross profits steadily increased during the years at issue, while their net income steadily decreased. He attributed a substantial part of this phenomenon to excessively high management fees. He ultimately opined that no bonuses should have been paid at all.

Petitioners offered, and the Court recognized, Brett Solomon as an expert in general financing arrangements. Mr. Solomon is currently a national director for Valuation Advisory Services at Cohn Reznick. He has provided numerous valuation opinions during his career and has advised many companies with respect to their financial arrangements.

Mr. Solomon determined that the five principals generated considerable economic value for the Water Companies. But he did not perform an independent

**[\*56]** valuation of them. Instead, he relied on a valuation performed in 2003 by the Strategic Equity Group (SEG) for the purpose of determining buy-in values for employee share purchases. For 2003 SEG valued PACE at $2.5 million, then applied to this figure an aggregate discount of 58% for lack of control and marketability. Employing the relatively low equity value thus determined, Mr. Solomon opined that a hypothetical independent investor in PACE would have received a reasonable return on his investment after the bonus payments were made.

On the valuation issue we find that respondent has the better side of the argument. Mr. Solomon did not perform an independent valuation of the Water Companies, and no one from SEG testified (as an expert witness or otherwise) at trial. The SEG valuation was prepared in 2003; it sheds no light on the proper valuation of PACE for 2004 and 2005, when its revenues were growing very rapidly. The SEG valuation was also intended for a very specific purpose: ascertaining an appropriate buy-in price for employee purchases of PACE stock. Petitioners have provided no evidence to establish that a 58% discount for lack of control and marketability would be appropriate for purposes of conducting the "reasonable compensation" analysis involved here. We will accordingly adopt the valuations for PACE that Mr. Atkins derived.

**[\*57]** Although we found Mr. Atkins' valuations and overall approach credible, we find it necessary to adjust his prebonus, pretax numbers in light of our holding regarding the "factoring fees." Mr. Atkins based his calculations on the income and expenses shown on the Water Companies' books. Because we have held that the "factoring fees" were not bona fide expenses but rather were distributions of profits, we believe these amounts must be added back to pretax income for purposes of conducting the "reasonable compensation" analysis.

We will now apply the Elliotts factors to determine the extent to which PACE's bonus payments were reasonable. In all cases, we use the term "employees" to refer, not to PMG or the S corporations, but to the five principals, who performed all relevant services and collectively owned 100% of PACE's stock.

### 1. Employee's Role in the Company

In applying this factor we consider how significant the employee is to the company. Elliotts, Inc., 716 F.2d at 1245. "Relevant considerations include the position held by the employee, hours worked, and duties performed * * * as well as the general importance of the employee to the success of the company." Ibid.

The five principals were indisputably critical to the Water Companies' success. Most of them had been employed by the Water Companies since the inception of their businesses, and they were responsible for all customer relationships.

[*58] If the factors we discuss below justify the payment of bonuses, the five principals would be entitled to them.

### 2. Comparison of Salaries With Salaries Paid by Similar Companies for Similar Services

Mr. Atkins determined that PACE's bonus payments were excessive in all years, based on the Zweig White survey of similarly situated firms. We find Mr. Atkins' general approach to be reasonable, but we must adjust his results for the factoring fees, which we add back to PACE's pretax profit for 2003-2005. Starting with Mr. Atkins' computations, we show below our calculation of PACE's revised prebonus profit and the bonuses it paid:

| Year | Atkins Pre-Bonus Profit | Add'l Factoring Fees | Revised Pre-Bonus Profit | Bonuses Paid | Bonus as % |
|---|---|---|---|---|---|
| 2003 | $516,662 | $292,230 | $808,892 | $300,000 | 37.1 |
| 2004 | 1,925,952 | 456,487 | 2,382,439 | 1,250,000 | 52.5 |
| 2005 | 2,945,645 | 612,605 | 3,558,250 | 2,065,000 | 58.0 |

Mr. Atkins determined that, for firms similarly situated to PACE, the median percentage of pretax profit devoted to bonus payments was approximately 35%, 44%, and 46% for 2003, 2004, and 2005, respectively. As shown above, the corresponding percentages for PACE were 37.1%, 52.5%, and 58.0%.[22] We ac-

---

[22]These figures exclude bonuses paid to rank-and-file PACE employees.

[*59] cordingly find that the bonuses paid by PACE were higher than bonuses paid by comparable engineering firms.

### 3. Character and Condition of the Company

In applying this factor we consider the bonus payments in light of "the company's size as indicated by its sales, net income, or capital value." Elliotts, Inc., 716 F.2d at 1246. As discussed above, the Water Companies experienced very rapid growth during the years at issue. PACE's revenues in particular rose from $3,730,989 in 2002 to $12,240,528 in 2005, a 328% increase. As shown in the table on the preceding page, PACE in each year had ample pretax profits (after adding back factoring fees) from which to pay bonuses.

### 4. Potential Conflicts of Interest

In applying this factor we consider "whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1)." Elliotts, Inc., 716 F.2d at 1246. That is unquestionably the case here. The five principals, who received the bonuses in question, were PACE's sole shareholders. And the "management fees" comprising the bonuses were a central component of Mr. Ryder's tax-minimization scheme, which the five principals implemented.

[*60] We also consider whether PACE's postbonus profits would be considered adequate from the viewpoint of a hypothetical independent investor. Ibid. Starting with Mr. Atkins' valuations, we show below our calculation of the equity re-turns earned by the principals in their capacity as shareholders of PACE:

| Year | Atkins Valuation | Revised Pre-Bonus Profit | Bonuses Paid | Profits for Shareholders | % Return on Equity |
|------|------------------|--------------------------|--------------|--------------------------|---------------------|
| 2003 | $3,912,834 | $808,892 | $300,000 | $508,892 | 13.0 |
| 2004 | 15,522,223 | 2,382,439 | 1,250,000 | 1,132,439 | 7.3 |
| 2005 | 26,499,388 | 3,558,250 | 2,065,000 | 1,493,250 | 5.6 |

Mr. Atkins' analysis indicates that these returns on equity were quite low for a firm like PACE, especially for 2004 and 2005.[23] Cf. Elliotts, Inc., 712 F.2d at 1247 (concluding that a 20% return on equity "would satisfy an independent investor"); Brinks Gilson & Lione v. Commissioner, T.C. Memo. 2016-20, 111 T.C.M. (CCH) 1079, 1083; Normandie Metal Fabricators, Inc. v. Commissioner, T.C. Memo. 2000-102, 79 T.C.M. (CCH) 1738, 1747 (concluding that returns on equity between 2.4% and 3.3% would not satisfy an independent investor), aff'd, 10 F. App'x 26 (2d Cir. 2001).

_____

[23]Mr. Atkins computed the Water Companies' returns on equity using a capital asset pricing model, which determines a company's cost of equity, i.e, its required rate of return from the perspective of a third-party investor.

**[\*61]**  5.  <u>Internal Consistency of Company's Compensation Payments</u>

In applying this factor we consider whether the company maintains a "structured, formal, consistently applied program" that evidences a "reasonable, long-standing, consistently applied compensation plan." <u>Elliotts, Inc.</u>, 716 F.2d at 1247.  The Water Companies had a consistently applied bonus program for rank-and-file employees, who received bonuses according to a fixed schedule when funds were available.  Under Mr. Ryder's scheme, however, the Water Companies had no plan of any sort for paying bonuses to the five principals.

None of the principals who testified at trial could explain how the bonus plan worked or what standards were applied.  Mr. Krebs testified that there was no set formula or schedule for determining the principals' bonuses.  There is no evidence that bonuses were paid according to any regular schedule or were actually designed to reflect the value of the principals' services.  And petitioners offered no evidence as to how the principals' bonuses (if any) were determined for years before 2000, when Mr. Ryder's scheme was put into effect.[24]

---

[24]A consideration that may be relevant in applying this fifth factor is whether the employee-shareholder's compensation is comparable to that of other company employees.  <u>Elliotts, Inc.</u>, 716 F.2d at 1247.  Given the distinct roles the five principals played in the Water Companies' success, we find that such a comparison would not be relevant or helpful here.  <u>See, e.g.</u>, <u>Clymer v. Commissioner</u>, T.C. Memo. 1984-203, 47 T.C.M. (CCH) 1576, 1583.

**[*62]**       6.       <u>Conclusion</u>

Applying the <u>Elliotts</u> factors in light of the record evidence, we find that a portion of PACE's bonus payments constituted reasonable compensation in each year. Given the absence of any structured bonus plan for the five principals, the existence of conflicts of interest, and the principals' clear intention "to disguise nondeductible corporate distributions of income as [deductible] salary expenditures," <u>Elliotts, Inc.</u>, 716 F.2d at 1246, we conclude that PACE is entitled to deduct bonus costs that are in the lowest quartile of similarly situated engineering firms. Mr. Atkins determined that, for similarly situated firms, the lowest quartile of bonus costs divided by pretax, prebonus profit was approximately 16.6% for 2003, 26.3% for 2004, and 15.4% for 2005. Adopting these percentages and running PACE's revised prebonus profit through Mr. Atkins' valuation methodology, we achieve the following results:

| Year | Atkins Valuation | Revised Pre-Bonus Profit | Bonus % | Bonuses Allowed | Profits for Shareholders | % Return on Equity |
|------|------|------|------|------|------|------|
| 2003 | $3,912,834 | $808,892 | 16.6% | $134,276 | $674,616 | 17.2 |
| 2004 | 15,522,223 | 2,382,439 | 26.3% | 626,581 | 1,755,858 | 11.3 |
| 2005 | 26,499,388 | 3,558,250 | 15.4% | 547,971 | 3,010,279 | 11.4 |

Allowing bonuses of this magnitude leaves sufficient profits in PACE to provide shareholder returns on equity of 17.2%, 11.3%, and 11.4% for 2003, 2004,

**[\*63]** and 2005, respectively. The data supplied by Mr. Atkins suggest that these returns would be deemed adequate by a hypothetical investor in a company like PACE. We accordingly find and hold that PACE is entitled to deductions under section 162 for bonus expenses of $134,276 for 2003, $626,581 for 2004, and $547,971 for 2005. The balances of the bonuses paid--$165,724 for 2003, $623,419 for 2004, and $1,517,029 for 2005--do not represent bona fide compensation for services rendered but rather constituted nondeductible distributions of corporate profits. We have reached these conclusions "[u]sing our best judgment, based on all the evidence in the record." Clymer, 47 T.C.M. (CCH) at 1583; see also Univ. Chevrolet Co. v. Commissioner, 16 T.C. 1452, 1455 (1951), aff'd, 199 F.2d 629 (5th Cir. 1952); Aries Commc'n Inc. & Subs. v. Commissioner, T.C. Memo. 2013-97, 105 T.C.M. (CCH) 1585, 1596.

IV.    Consequences for the Five Principals

In the notices of deficiency the IRS determined that the five principals had received unreported income by virtue of the various corporate payments discussed above. Respondent subsequently conceded that the unreported income amounts appearing in the notices of deficiency should be reduced by the salary amounts shown on Forms W-2 issued to the five principals. After making that offset, the amounts of unreported income remaining in dispute appear to be as follows:

| Principal | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Perslow | $30,664 | $23,488 | $46,928 | $350,207 |
| Severson | 1,056 | 18,969 | 122,477 | 259,259 |
| Krebs | 61,164 | 173,075 | 137,688 | 217,748 |
| Hartwell | 21,436 | 26,405 | 37,404 | 86,203 |
| Boultinghouse | -0- | -0- | -0- | 304,205 |

The IRS based its determinations of unreported income on four alternative theories: constructive dividends, assignment of income, lack of economic substance, and lack of arm's-length pricing under section 482. We will decide this issue chiefly on the basis of respondent's constructive dividend theory.

A.     Constructive Dividends

The IRS' determination of constructive dividend income is a determination of unreported income. See Coastal Heart Med. Grp., Inc. v. Commissioner, T.C. Memo. 2015-84, 109 T.C.M. (CCH) 1424, 1429. The Ninth Circuit has held that the IRS must provide some reasonable foundation connecting the taxpayer with the income-producing activity. See Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). Once the IRS has produced evidence linking the taxpayer with an income-producing activity, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the

**[\*65]** IRS' determinations are arbitrary or erroneous.  <u>Helvering v. Taylor</u>, 293 U.S. 507, 515 (1935).

Respondent has clearly established an evidentiary foundation to shift the burden to petitioners.  The five principals owned 100% of the Water Companies' stock.  The funds that flowed out of the Water Companies as disguised expenses represented either compensation for the principals' services or distributions, and those amounts were either paid to them or held and invested for their future benefit.

Sections 301 and 316 govern the characterization for Federal income tax purposes of corporate distributions of property to shareholders.  If the distributing corporation has sufficient earnings and profits (E&P), the distribution is a dividend that the shareholder must include in gross income.  Sec. 301(c)(1).  If the distribution exceeds the corporation's E&P, the excess represents a nontaxable return of capital or capital gain.  Sec. 301(c)(2) and (3).

The taxpayer bears the burden of proving that the corporation lacks sufficient E&P to support dividend treatment at the shareholder level.  <u>Truesdell v. Commissioner</u>, 89 T.C. 1280, 1295-1296 (1987); <u>Fazzio v. Commissioner</u>, T.C. Memo. 1991-130, <u>aff'd</u>, 959 F.2d 630 (6th Cir. 1992); <u>Zalewski v. Commissioner</u>, T.C. Memo. 1988-340; <u>Delgado v. Commissioner</u>, T.C. Memo. 1988-66.  Petition-

[*66] ers produced no evidence concerning the Water Companies' E&P during the years at issue and have thus failed to satisfy their burden of proof. See Truesdell, 89 T.C. at 1295-1296; Vlach v. Commissioner, T.C. Memo. 2013-116, 105 T.C.M. (CCH) 1690, 1694 n.23. We therefore deem the Water Companies to have had, after add-back of the disallowed deductions for bonuses and factoring fees, sufficient E&P in each year to support dividend treatment.

Dividends may be formally declared or constructive. A constructive dividend is an economic benefit conferred upon a shareholder by a corporation without an expectation of repayment. Truesdell, 89 T.C. at 1295 (citing Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir. 1966), aff'g T.C. Memo. 1965-84). "Corporate expenditures constitute constructive dividends only if (1) the expenditures do not give rise to a deduction on behalf of the corporation and (2) the expenditures create 'economic gain, benefit, or income to the owner-taxpayer.'" P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th. Cir. 1987) (quoting Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984)), aff'g T.C. Memo. 1984-549.

Corporate payments to third parties may constitute constructive dividends if they are made on behalf of a shareholder or for his economic benefit. United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991); see, e.g., Grossman v. Commis-

**[\*67]** <u>sioner</u>, 182 F.3d 275 (4th Cir. 1999) (corporate payments for family vacations), <u>aff'g</u> T.C. Memo. 1996-452; <u>Noble</u>, 368 F.2d at 441 (corporate payment for repairs and painting of shareholder's residence and for shareholder's travel expenses). The amount of the constructive dividend equals the fair market value of the benefit received. <u>Challenge Mfg. Co. v. Commissioner</u>, 37 T.C. 650, 663 (1962); <u>Schank v. Commissioner</u>, T.C. Memo. 2015-235, 110 T.C.M. (CCH) 542, 548. Whether corporate expenditures are disguised dividends presents a question of fact. <u>DKD Enters. v. Commissioner</u>, 685 F.3d 730, 735 (8th Cir. 2012), <u>aff'g in part, rev'g in part</u>, T.C. Memo. 2011-29; <u>Schank</u>, 110 T.C.M. (CCH) at 548.

In disallowing the Water Companies' deductions for factoring fees and the bulk of PACE's claimed deductions for bonuses, we have determined that none of these expenditures "give[s] rise to a deduction on behalf of the corporation." <u>P.R. Farms, Inc. v. Commissioner</u>, 820 F.2d at 1088. The remaining question is whether these expenditures "create[d] 'economic gain, benefit, or income to the owner-taxpayer.'" <u>Ibid.</u> We find that they did.

The principals hired Mr. Ryder to create a tax structure that would enable them to defer taxation of substantial portions of their income, paying current tax only on income needed to defray current living expenses. The bulk of the Water

[*68] Companies' profits was distributed through PMG as disguised expenses and was invested for the principals' benefit on a tax-free basis. It is clear that the funds extracted from the Water Companies in this way "create[d] 'economic gain, benefit, or income to the owner-taxpayer[s].'" Ibid.

We have determined that the following amounts were not deductible by the Water Companies but were disguised distributions of corporate profits.

| Expense | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|
| PAQ Factoring | -0- | $505,930 | $511,930 | $619,395 | $1,637,255 |
| PAI Factoring | -0- | 43,463 | 79,756 | 28,182 | 151,401 |
| PACE Factoring | $350,834 | 292,230 | 456,487 | 612,605 | 1,712,156 |
| PACE Bonuses | -0- | 165,724 | 623,419 | 1,517,029 | 2,306,172 |
| Total | 350,834 | 1,007,347 | 1,671,592 | 2,777,211 | 5,806,984 |

We must now apportion these amounts among the five principals. This is no easy task. The principals had differing ownership interests in the Water Companies, and PAI's profits appear to have been distributed in a manner that did not reflect actual share ownership. The Water Companies had differing amounts of disallowed expenses, and those expenses differed in character (PERC, for example, did no "factoring"). The calculation is further complicated by the Water Companies' use of different fiscal years.

[*69] Scientific accuracy being impossible, we will apportion the corporate distributions among the five principals on the basis of the S corporations' respective ownership interests in PMG, which were designed to approximate the principals' blended ownership interests in the Water Companies. As reflected on the Schedules K-1 included in PMG's partnership tax returns, the S corporations as of December 31, 2002, had the following percentage ownership interests in PMG (amounts do not total 100% because of rounding):

| S Corporations | % Interest |
|---|---|
| Perslow Inc. | 38.6 |
| Severson Inc. | 27.6 |
| Krebs Inc. | 21.0 |
| Hartwell Inc. | 7.6 |
| Boultinghouse Inc. | 5.3 |

Applying these percentage ownership interests, we apportion the Water Companies' disallowed expenses among the five principals as follows (amounts do not total exactly due to rounding of ownership percentages):

| Year | Disallowed Expenses | Perslow @ 38.6% | Severson @ 27.6% | Krebs @ 21.0% | Hartwell @ 7.6% | B'house @ 5.3% |
|---|---|---|---|---|---|---|
| 2002 | $350,834 | $135,422 | $96,830 | $73,675 | $26,663 | $18,594 |
| 2003 | 1,007,347 | 388,836 | 278,028 | 211,543 | 76,558 | 53,389 |
| 2004 | 1,671,592 | 645,235 | 461,359 | 351,034 | 127,041 | 88,594 |

[*70]

| | | | | | | |
|---|---|---|---|---|---|---|
| 2005 | 2,777,211 | 1,072,003 | 766,510 | 583,214 | 211,068 | 147,192 |
| Total | 5,806,984 | 2,241,496 | 1,602,727 | 1,219,466 | 441,330 | 307,769 |

For each year in issue, the disallowed corporate expenses that we have apportioned to Messrs. Perslow, Severson, Krebs, and Hartwell, as shown above, exceed the amounts of unreported income on which the IRS seeks to tax those individuals. The notices of deficiency shed no light on how the IRS determined the amounts of unreported income, and respondent offered no explanation of his calculations at trial or in his post-trial briefs. Nor has respondent moved to amend his pleadings to assert increased deficiencies against these individuals. We accordingly find that the following four individuals received taxable constructive dividends equal to the amounts of unreported income remaining in dispute, as follows:

| Principal | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Perslow | $30,664 | $23,488 | $46,928 | $350,207 |
| Severson | 1,056 | 18,969 | 122,477 | 259,259 |
| Krebs | 61,164 | 173,075 | 137,688 | 217,748 |
| Hartwell | 21,436 | 26,405 | 37,404 | 86,203 |

The situation is different for Mr. Boultinghouse. Respondent has alleged no unreported income for him in 2002, 2003, or 2004, but alleges unreported income

**[*71]** of $304,205 in 2005. The disallowed corporate expenses we have apportioned to Mr. Boultinghouse for 2005 are only $147,192. We accordingly find that he received a taxable constructive dividend in 2005 of $147,192.

B.    Assignment of Income

We have determined that PACE is entitled to deductions for the following amounts of compensation for services, in addition to the salary amounts reflected on the Forms W-2 issued to the five principals:

| Compensation | 2003 | 2004 | 2005 |
|---|---|---|---|
| Add'l base comp. | $19,234 | $111,427 | $16,138 |
| Bonuses | 134,276 | 626,581 | 547,971 |
| Total | 153,510 | 738,008 | 564,109 |

These amounts were paid to PMG as nominal "management fees," then distributed (in part) to the five S corporations, then distributed (in part) to the five ESOPS. We must consider whether these amounts were taxable to the five principals individually under respondent's "assignment of income" theory. Our resolution of this issue is properly adjudicated in the deficiency proceedings because the assignment of income relates to determinations with respect to the five principals in their deficiency cases, not to partnership items of PMG. See Hang v. Commissioner, 95 T.C. 74, 82 (1990) (holding, in the context of an S corporation then sub-

[*72] ject to TEFRA partnership procedures, that whether the taxpayer was the beneficial owner of the interest was a shareholder-level item); Olsen-Smith, Ltd. v. Commissioner, T.C. Memo. 2005-174, 90 T.C.M. (CCH) 64, 67 (holding same in the context of a partnership subject to TEFRA procedures); Grigoraci v. Commissioner, T.C. Memo. 2002-202, 84 T.C.M. (CCH) 186, 191.

As explained previously, the constructive dividends we have determined exceed, by themselves, the amounts of unreported income that respondent contends were received by Messrs. Perslow, Severson, Krebs, and Hartwell during the years at issue. Because we cannot allocate to those four individuals unreported income in excess of the amounts set forth in the notices of deficiency, we need not consider respondent's "assignment of income" argument as applied to them.

The situation again differs for Mr. Boultinghouse. Respondent alleges that he received unreported income of $304,205 for 2005, but we find that he received constructive dividends of only $147,192 for that year. We accordingly must consider respondent's "assignment of income" theory as applied to the $157,013 balance of the alleged unreported income.

A longstanding principle of tax law is that income is taxed to the person who earns it. United States v. Basye, 410 U.S. 441, 450 (1973) ("[H]e who earns income may not avoid taxation through anticipatory arrangements no matter how

**[\*73]** clever or subtle[.]" (citing <u>Lucas v. Earl</u>, 281 U.S. 111, 115 (1930))). A person who earns income "cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity." <u>Id.</u> at 449.

Under Mr. Ryder's tax-minimization scheme, Mr. Boultinghouse remained the CFO of all four Water Companies, and he continued to provide them with exactly the same financial and accounting services he had supplied previously. But now he supplied those services as an "employee" of his S corporation, which allegedly supplied his services to PMG, which allegedly supplied his services as an "independent contractor" to the Water Companies. He signed a purported "agreement of employment" with his S corporation, but that document did not specify what position he was to hold or what duties he was to perform. Rather, it simply recited that he would "render and perform services under the direction and designation of" his S corporation. Because his S corporation was a paper entity and functionally his alter ego, that recitation was meaningless. In reality, he performed services for the Water Companies "under the direction and designation" of himself.

The "agreement of employment," like PMG's purported agreement to provide Mr. Boultinghouse's services as an "independent contractor" to the Water

[*74] Companies, did not in any meaningful way change the employer-employee relationship he had with those corporations.  Mr. Ryder's tax-minimization plan was a classic "assignment of income" scheme whereby Mr. Boultinghouse used a series of contractual arrangements to divert salary income that would otherwise have flowed directly to him.  See Basye, 410 U.S. at 450.  But no anticipatory arrangement can hide the fact that his share of the management fees was in substance earned by and owed to him.

We recognize the principle that a corporation (including an S corporation) is a separate taxable entity.  See Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943).  But the relevant question is not simply "who earned the income" but rather "who controls the earning of the income."  See Johnson v. Commissioner, 78 T.C. 882, 891 (1982) (citing Vercio v. Commissioner, 73 T.C. 1246, 1254-1255 (1980)), aff'd without published opinion, 734 F.2d 20 (9th Cir. 1984); Fleischer v. Commissioner, T.C. Memo. 2016-238, 112 T.C.M. (CCH) 723, 725.

In a setting such as this, two elements are generally required before the corporation will be regarded as the party that controls the earning of the income: (1) the corporation must be able to direct and control the employee in a meaningful way and (2) "there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's

[*75] controlling position." Johnson, 78 T.C. at 891; see Idaho Ambucare Ctr., Inc. v. United States, 57 F.3d 752, 754-755 (9th Cir. 1995) (same).

We find that the first requirement is not satisfied here because Boultinghouse Inc., the S corporation, was not able to (and did not in fact) "direct and control" Mr. Boultinghouse in any meaningful way. The S corporation was a paper entity. His purported "agreement of employment" with it did not specify what position he was to hold or what duties he was to perform. And far from rendering his services under the "direction and designation of" his S corporation, he in fact supervised his own employment by directing the day-to-day activities of the Water Companies. The documents Mr. Ryder drafted were not worth the paper they were printed on. They were designed to create, and they had the effect of producing, an anticipatory assignment of Mr. Boultinghouse's income to a tax-exempt entity Mr. Ryder had created for that purpose. See Vnuk v. Commissioner, 621 F.2d 1318, 1320-1321 (8th Cir. 1980), aff'g T.C. Memo. 1979-164.

In sum, we conclude that the assignment-of-income principle is fully applicable here because Mr. Boultinghouse's S corporation was not able to (and did not in fact) "direct or control in some meaningful sense the activities of the service provider." Idaho Ambucare Ctr., Inc., 57 F.3d at 754-755; Johnson, 78 T.C. at 891

**[\*76]** (same).[25]  Once again, we must apportion to Mr. Boultinghouse his ratable share of the $564,109 additional compensation that we have allowed the Water Companies to deduct for 2005.  For lack of any better evidence, we will again consider Boultinghouse Inc.'s ownership interest in PMG, which was designed to approximate Mr. Boultinghouse's blended ownership interests in the Water Companies.  That percentage interest being 5.3%, we find that Mr. Boultinghouse for 2005 is taxable under the assignment-of-income doctrine on unreported income of $29,898 (.053 × $564,109).

## V.  PMG

In light of our holdings above with respect to the Water Companies and the five principals, we need not address any of respondent's determinations in the FPAA issued to PMG.  The Water Companies and the principals are the only taxpaying persons in these cases.  Having adjudicated all items in the notices of deficiency issued to them, we have no reason to discuss any of respondent's arguments in the FPAA, which respondent tendered as alternative grounds for ruling in his favor.

---

[25]In view of our disposition, we need not address whether the second requirement of the Johnson test is met, viz, whether there existed a bona fide "contract or similar indicium recognizing the corporation's controlling position." Johnson, 78 T.C. at 891.

**[\*77]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.

**[*78]**                                    APPENDIX A

Johan A. Perslow, docket No. 28655-11; Mark E. Krebs & Janet Torrey B. Krebs, docket No. 29777-11; Pacific Environmental Resources Corporation, docket No. 3264-12; Gary J. Tolosa & Zoila M. Tolosa, docket No. 13818-12; Derek H. Karimoto & Debbie J. Karimoto, docket No. 13819-12; Andrew D. Komor & Summer J. Komor, docket No. 13820-12; Mark E. Krebs & Janet B. Krebs, docket No. 13821-12; Michael G. Krebs & Laura M. Krebs, docket No. 13822-12; James A. Matthews, Jr. & Kristen L. Matthews, docket No. 13823-12; Johan A. Perslow, docket No. 13824-12; Bruce M. Phillips & Laura K. Phillips, docket No. 13825-12; Cory M. Severson & Rochelle L. Severson, docket No. 13826-12; Sonny O. Sim & Emily C. Ang, docket No. 13827-12; Pacific Aquascape California Incorporated, docket No. 5064-13; Sonny O. Sim & Emily A. Sim, docket No. 15201-13; Gary J. Tolosa & Zoila M. Tolosa, docket No. 15202-13; Water Specialty Group Incorporated a.k.a. Water Specialty Group, docket No. 20708-13; Perc Water Corporation & Subsidiaries a.k.a. Perc Water Corporation, docket No. 20709-13; Pacific Environmental Resources Corporation, a Arizona Corporation (Perc), docket No. 20710-13; Michael G. Krebs & Laura M. Krebs, docket No. 21956-13; Mark E. Krebs & Janet Torrey Krebs, docket No. 21957-13; Gary J. Tolosa & Zoila M. Tolosa, docket No. 21958-13; Cory M. Severson & Rochelle L. Severson, docket No. 21959-13; Sonny O. Sim & Emily A. Sim, docket No. 21960-13; Bruce M. Phillips and Laura K. Phillips, Deceased, docket No. 21961-13; James A. Matthews, Jr. & Kristen L. Matthews, docket No. 21962-13; Andrew T. Komor & Summer J. Komor, docket No. 21963-13; Derek H. Karimoto & Debbie J. Karimoto, docket No. 21964-13; and Johan A. Perslow, docket No. 21965-13.

**[*79]**                                          APPENDIX B

Cory M. Severson & Rochelle Severson, docket No. 6412-07:  Respondent concedes that petitioners did not have unreported ordinary dividend income of $12,159 for 2005.  Petitioners concede that they have unreported constructive dividend income of $3,004, $5,866, $16,602, and $2,388, for 2002-2005, respectively.

Pacific Aquascape International, Inc., docket No. 6413-07:  Petitioner concedes that it is not entitled to claim interest expense deductions in the amounts of $16,504, $2,012, and $9,625, for 2003-2005, respectively.  Respondent concedes that petitioner is entitled to deductions for facility costs in the amounts of $14,479, $23,511, and $6,426, for 2003-2005, respectively.

Pacific Environmental Resources, Corp., docket No. 6414-07:  Petitioner concedes that it is not entitled to claim deductions for personal expenses of $49,685 for 2005.

Mark E. Krebs & Janet B. Krebs, docket No. 6494-07:  Respondent concedes that petitioners are entitled to an additional capital loss deduction of $5,401 for 2003; that they did not have unreported capital gains income of $40,479 for 2005; and that they did not have unreported ordinary dividend income of $9,391 for 2005.  Petitioners concede that they have unreported constructive dividend income of $8,508, $5,009, $7,937, and $22,252, for 2002-2005, respectively.

Johan A. Perslow & Marie Majkgard Perslow, docket No. 6498-07:  Petitioners concede they are liable for an addition to tax under section 6651(a)(1) of $2,986 for 2003.  Petitioners concede that they have unreported constructive dividend income of $20,312, $18,000, and $37,440, for 2002-2004, respectively.

Pacific Aquascape, Inc., docket No. 6499-07:  Petitioner concedes that it is not entitled to claim deductions for personal expenses in the amounts of $5,135, $11,092, and $24,898, for 2003-2005, respectively and that it is not entitled to claim a deduction for marketing expenses paid to PAI in the amount of $300,000 for 2005.  Petitioner also concedes that it is not entitled to claim interest expense deductions in the amounts of $12,351, $7,032, and $24,813, for 2003-2005, re-

[*80] spectively, and that it is not entitled to claim a net operating loss deduction of $53,162 for 2003.

Pacific Advanced Civil Engineering, Inc., docket No. 6593-07:  Petitioner concedes that it is not entitled to claim deductions for personal expenses in the amounts of $32,871, $57,128, $37,389, and $99,556, for 2002-2005, respectively; that it is not entitled to claim deductions under section 179 for qualified asset purchases in the amounts of $4,977, $24,912, $130,638, and $294,304, for 2002-2005, respectively; and that it is entitled to claim depreciation deductions in the amounts of $249, $6,874, $15,638, and $113,967, for 2002-2005, respectively. Petitioner also concedes that it is not entitled to claim interest expense deductions in the amounts of $13,104, $13,189, and $1,095 for 2002, 2003, and 2005, respectively.

Richard F. Boultinghouse & Loraine Boultinghouse, docket No. 6594-07:  Petitioners concede that they are not entitled to claim a net operating loss carryforward deduction of $193,701 for 2005.

Johan A. Perslow, docket No. 6596-07:  Petitioner concedes that he is liable for an addition to tax under section 6651(a)(1) of $13,844 for 2005.  Petitioner concedes that he has unreported constructive dividend income of $421,187 for 2005.